Alexandr Yakovlev, Pro Se
Electronic service address:
750emerealdbay@gmail.com

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALEXANDR YAKOVLEV, | ) **Case No.:** 2:25-cv-03110-DJC-CSK |
| | ) |
| Plaintiff, | ) **SECOND AMENDED** |
| v. | ) **COMPLAINT FOR VIOLATIONS** |
| | ) **OF TITLE II OF THE** |
| SUPERIOR COURT OF CALIFORNIA, | ) **AMERICANS WITH** |
| COUNTY OF EL DORADO; and | ) **DISABILITIES ACT AND THE** |
| | ) **DUE PROCESS AND EQUAL** |
| CALIFORNIA COURT OF APPEAL, | ) **PROTECTION CLAUSES OF THE** |
| THIRD APPELLATE DISTRICT; | ) **FOURTEENTH AMENDMENT** |
| | ) |
| Defendants. | ) **DEMAND FOR JURY TRIAL** |
| | ) |

## I.   INTRODUCTION: A PATTERN OF INSTITUTIONAL EXCLUSION

1.     **The Foundation of Trauma and Disability:** Plaintiff Alexandr Yakovlev came to the United States seeking refuge from persecution, only to be ensnared in a decades-long cycle of institutional betrayal that forged the very disabilities now used to exclude them from justice. After fleeing discrimination in Russia, Plaintiff applied for asylum within the required one-year period. The application was wrongly denied on the specious ground that Plaintiff remained a Russian citizen—a fact irrelevant to asylum eligibility and demonstrative of the system's reflexive disregard for evidence. Forced to return, Plaintiff discovered Russia had terminated their citizenship, rendering them stateless. Upon returning to U.S. immigration authorities to seek review of this catastrophic error, Plaintiff was

not heard. Instead, they were imprisoned in detention for six months. Officials repeatedly stated Plaintiff would be detained indefinitely—a "life sentence"—because they could not be deported to a country that no longer claimed them.

**2.     The Creation of Disabilities:** After nearly two decades of legal purgatory, Plaintiff finally secured asylum by proving a bitter irony: they had been persecuted more severely by the U.S. immigration system than by the country they originally fled. This traumatic saga—of being falsely rejected, rendered stateless, imprisoned without cause, and told their captivity was permanent—directly caused the severe Post-Traumatic Stress Disorder, cognitive processing disorders, and debilitating anxiety that define Plaintiff's disabilities today. Plaintiff now suffers from an acute, disability-based terror of procedural systems that issue false, predetermined rejections without reviewing evidence, as such systems are painful re-enactments of the trauma that nearly destroyed their life.

**3.     The Pattern Repeats in the Courts:** The Defendant courts have not merely failed to accommodate these disabilities; they have **replicated the exact pattern of institutional betrayal** that caused Plaintiff's trauma. **Defendants denied Plaintiff access to the courts by relying on a "vexatious litigant" label without providing Plaintiff with the underlying evidence or accommodating Plaintiff's disabilities.** This practice—of issuing **unreviewed, copy-paste dismissals** without meaningful consideration of Plaintiff's disabilities or claims—**violates the ADA and Due Process Clause**.

Just as officials used imprisonment as a tool for administrative convenience, the courts use inaccessible procedures, "Catch-22" filing barriers, and automated rejections to imprison Plaintiff's cases in a void. Just as Plaintiff was met with institutional indifference to their statelessness, they are now met with judicial refusal to acknowledge their non-binary identity, with judges and clerks persistently using "Mr." and "he" to signal a refusal to see Plaintiff as a person worthy of individualized consideration.

4.     **Nature of This Action:** This lawsuit challenges the institutional policies of the Superior Court of California, County of El Dorado and the California Court of Appeal, Third Appellate District that systematize this discriminatory pattern. Plaintiff does not sue individuals, but the customs and practices that filter out disabled, *pro se* litigants through automated rejection of accommodation requests, discriminatory notice schemes, templated orders issued without reading filings, and circular procedural traps. These policies violate:

**a.** Title II of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12132, by denying meaningful access to court services.

**b.** The Due Process Clause of the Fourteenth Amendment, by constructing fundamentally unfair procedures that preclude any real opportunity to be heard.

**c.** The Equal Protection Clause of the Fourteenth Amendment, by intentionally treating Plaintiff differently based on disability and gender identity.

5.     **The Irreparable Harm:** The Defendants' policies have blocked

Plaintiff from appealing four cases where third parties seek to evict, expel, defraud, or terminate the benefits of a disabled asylee to have them deported. The triggering of Plaintiff's trauma-based disabilities by these judicial barriers has caused severe medical harm, including hospitalizations. An imminent, fraudulent sanctions order threatens garnishment of Plaintiff's disability benefits, promising homelessness, starvation, and death. This is not mere litigation friction; it is the operationalization of a bureaucratic violence that Plaintiff has already survived once, at tremendous cost.

## II.    THE INSTITUTIONAL REPLICATION OF TRAUMA
### A. The Disability and Its Origin

**6.**    Plaintiff's disabilities are not congenital but were forged by specific, prolonged institutional malfeasance. The experience of:

**a.** Applying for protection and receiving a false, evidence-free denial.

**b.** Being rendered stateless and subsequently imprisoned without cause.

**c.** Being told freedom was impossible due to bureaucratic failure. directly caused the severe PTSD, depression, cognitive impairments, and acute procedural anxiety that substantially limit major life activities today. This history makes Plaintiff uniquely vulnerable to, and uniquely harmed by, government systems that issue rote rejections without reviewing the file—the precise pattern exhibited by the Defendants.

### B.    The Creation and Documentation of Disabilities

### The Medical and Legal Documentation of Plaintiff's Disabilities

Plaintiff's disabilities are both medically documented and legally recognized, having been forged through a prolonged saga of institutional betrayal and subsequently weaponized by the same systems that should provide accommodation.

**1. The Causal Trauma:** After nearly two decades of legal purgatory, Plaintiff secured asylum by proving a bitter irony: they had been persecuted more severely by the U.S. immigration system than by the country they originally fled. This traumatic experience—being falsely rejected, rendered stateless, imprisoned without cause, and told their detention was permanent—directly caused and medically substantiated the severe Post-Traumatic Stress Disorder, cognitive processing disorders, and debilitating anxiety that substantially limit Plaintiff's major life activities today.

**2. Medical Documentation of Disabilities:** Plaintiff's disabilities are thoroughly documented in medical records, including but not limited to **Exhibit I, "Surgery 7-13-21"**, which details surgical intervention and related disability assessments. These records establish the objective medical basis for Plaintiff's conditions long before the current court proceedings.

**3. The Foundational Fraud That Triggered Current Discrimination:** The current cycle of judicial discrimination originates from a fraudulent disability assessment by Defendant Marchita Masters. On **June 3, 2021**, Masters falsely diagnosed Plaintiff with **"malingering"**—a claim fabricated to attack Plaintiff's disability status (See **Exhibit H, "Barton Marchita addendums"**). This false diagnosis became the pretext for a coordinated campaign to terminate Plaintiff's

disability benefits and justify subsequent discriminatory treatment across multiple institutions.

**4. Official Recognition and Validation of Disabilities:** Despite this fraudulent "malingering" claim, Plaintiff's disabilities were formally validated by the Social Security Administration. On **August 11, 2023**, the SSA issued a formal **"SSI Approved"** determination (See **Exhibit H**), confirming Plaintiff's eligibility for Supplemental Security Income based on documented disabilities. This federal determination conclusively refutes Masters' false allegations and legally establishes Plaintiff's status as a "qualified individual with a disability" under the ADA.

**5. The Present Trauma Response:** Plaintiff now suffers from an acute, disability-based terror of procedural systems that issue false, predetermined rejections without reviewing evidence. Defendants' current practices—rejecting filings based on fraudulent predicates, refusing to review documentation, and issuing automated denials—are painful re-enactments of the original trauma. Each instance of:

- Courts refusing to read filings before rejection.

- Clerks applying vexatious litigant labels without verifying identity.

- Judges dismissing cases based on concealed evidence

directly triggers Plaintiff's PTSD and anxiety disorders, creating a debilitating feedback loop where seeking justice exacerbates the very disabilities that require accommodation.

**6. The Direct Connection Between Past and Present Discrimination:** The

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF TITLE II OF THE ADA AND THE DUE PROCESS
AND EQUAL PROTECTION CLAUSES OF THE FOURTEENTH AMENDMENT

pattern is unmistakable and intentional:

- **2021:** Marchita Masters falsely claims "malingering" to attack disability status to have Plaintiff's asylum terminated.

- **2023:** Federal government formally approves disability benefits, disproving Masters' fraud.

- **2025:** Courts systematically reject Plaintiff's filings using the same fraudulent foundation, refusing to acknowledge the SSA's contrary determination and Plaintiff's documented disabilities.

This continuum demonstrates that the current judicial discrimination is not independent but a direct extension of the original fraudulent attack on Plaintiff's disability status—an institutionalized pattern of discrediting Plaintiff's disabilities to justify exclusion.

**C.     Institutional Policy 1: The Predetermined, Unreviewed Rejection**

**7.** Both Defendants maintain a policy of adjudicating Plaintiff's filings through automated, non-individualized processes, issuing identical, copy-paste orders that demonstrate no meaningful consideration of the specific case, Plaintiff's claims, or documented disabilities.

**Manifestation: Template Orders & Erroneous Service Proving Lack of Review:** This policy is conclusively demonstrated by the Court of Appeal's actions across Plaintiff's appeals. On November 21, 2025, the Court issued six substantively identical orders denying extensions in three unrelated appeals (C104874, C104875,

C104876). These orders were not mere boilerplate; they were served in a manner proving the Court failed to perform even a basic review of party identities. Critically, in the appeal against Lake Tahoe Community College (C104874) (Exhibit R, "C104874 - Order - ORDER ON REHEARING DUE"), the Court's servicing notification and official mailing list erroneously included counsel for Defendant Marchita Masters—a party in a completely separate case (C105047). This fundamental error in identifying the correct opposing counsel provides irrefutable evidence that the Court processed these appeals as an indistinguishable batch, without reviewing the basic record. The Court subsequently issued dismissals on December 2 and 15, 2025, using identical language to deny reinstatement, falsely stating Plaintiff "failed to show" the appeals had merit, despite never having conducted an individualized assessment of the distinct disability discrimination claims in each case.

**Harm:** This policy of automated, batch-processing adjudication directly triggers Plaintiff's disability by replicating the core trauma of an indifferent system issuing catastrophic decisions without examining the individual or the facts. It violates the Due Process Clause by rendering any opportunity to be heard a sham and violates the ADA's mandate for reasonable modifications through an individualized, interactive process, as required by 28 C.F.R. § 35.130(b)(1)(ii) and *Wong v. Regents of Univ. of Cal.*, 192 F.3d 807, 818 (9th Cir. 1999).

### D.    Institutional Policy 2: Concealment of Foundational Documents

**8.**    The Superior Court maintains a practice of adjudicating cases based on

documents it withholds from disabled *pro se* litigants, creating a "secret record."

**Manifestation:** The dispositive orders of September 12, 2025, reference a "Motion to Dismiss with Prejudice" filed July 17, 2025 (Exhibit D) Despite multiple requests (Exhibit J, "Envelope 25ED00054400," "Request for Copies 10-15-25"), neither Defendant nor the Court has ever provided Plaintiff with a copy of this standalone motion. The only document Plaintiff received was a single filing titled "Motion for Sanctions," (Exhibits D, M) which contained arguments for dismissal within its text. This suggests Defendant may have filed a single, procedurally defective combined motion for sanctions and dismissal. California law does not permit such a combined filing, as a motion for sanctions requires a mandatory 21-day safe harbor period before filing, which a concurrent motion to dismiss would violate. The Court had a duty to reject this defective filing. Instead, it accepted the filing, treated it as two separate motions, and granted both, adjudicating a "Motion to Dismiss" that Plaintiff never received as a distinct document. This denial of notice—being sanctioned and dismissed based on a hidden procedural instrument—is a fundamental violation of due process.

**Harm:** This practice of deciding cases on concealed evidence is a quintessential due process violation. It directly triggers Plaintiff's anxiety flashbacks to the asylum process, where life-altering decisions were made based on hidden or false reasoning.

**E.    Institutional Policy 3: Discriminatory Disregard for Gender Identity**

**9.**     Both Defendants enforce a custom of willfully disregarding Plaintiff's non-binary identity despite formal corrections, signaling institutional contempt.

**Manifestation:** Judges and clerks persistently use "Mr." and "he" in hearings, communications, and orders. This is not an oversight but a choice, demonstrating that the institution views Plaintiff as an unperson whose fundamental identity is irrelevant—a painful echo of the statelessness imposed by immigration authorities.

**Harm:** This misgendering intentionally exacerbates Plaintiff's gender dysphoria and PTSD. It constitutes deliberate discrimination on the basis of gender identity in violation of the Equal Protection Clause and the ADA.

### F.     Institutional Policy 4: The Circular "Vexatious Litigant" Trap

**10.**     The Defendants collaboratively enforce the "vexatious litigant" designation through a closed loop that makes compliance impossible, functioning as a procedural deportation from the justice system.

**Manifestation:** The Superior Court rejects all filings because Plaintiff lacks a prefiling order, while blocking the filing needed to request that order. The Court of Appeal then dismisses appeals for failing to overcome this impossible barrier. This circular logic—where barred access is both the penalty and the barrier to review—creates a permanent, self-executing denial of access to the courts.

**Harm:** This policy is the operational core of the access denial. It institutionalizes a permanent, evidence-free exclusion based on a label, replicating the

original trauma and violating fundamental due process.

## III.    JURISDICTION AND VENUE

1.    **Federal Question Jurisdiction:** This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343(a)(3)-(4). The action arises under Title II of the ADA, 42 U.S.C. § 12132 for deprivation of rights secured by the Fourteenth Amendment.

2.    **Abrogation of Sovereign Immunity:** Congress validly abrogated state sovereign immunity for Title II ADA claims that implicate fundamental rights, including access to the courts. *Tennessee v. Lane*, 541 U.S. 509, 533–34 (2004). The institutional policies challenged here—systematically blocking judicial access through inaccessible procedures—directly implicate this fundamental right.

3.    **Ex Parte Young Doctrine & Abrogation of Sovereign Immunity:** The doctrine of *Ex Parte Young*, 209 U.S. 123 (1908), permits suits for prospective injunctive relief against state officials to remedy ongoing violations of federal law. Here, Plaintiff seeks precisely such relief to halt the Defendants' ongoing enforcement of institutional policies that violate the ADA and the Fourteenth Amendment. Furthermore, Congress has validly abrogated state sovereign immunity for Title II of the ADA when, as here, the violations implicate a fundamental right—specifically, the right of access to the courts. *Tennessee v. Lane*, 541 U.S. 509, 533–34 (2004). Plaintiff seeks only declaratory and injunctive relief against the institutional Defendants to compel their future compliance with federal law.

4.     **Venue:** Venue is proper in the Eastern District of California under 28 U.S.C. § 1391(b)(2). All Defendant entities are located within this District, and substantial events giving rise to these claims occurred in El Dorado County, within this District.

## IV.     PARTIES

### A. Plaintiff: ALEXANDR YAKOVLEV

Plaintiff is a natural person residing in El Dorado County, California.

1.     **Qualified Individual:** Plaintiff is a "qualified individual with a disability" under 42 U.S.C. § 12131(2). Documented disabilities include:

- **Fibromyalgia and Mobility Limitations:** Chronic pain and fatigue preventing travel to courthouses, standing in lines, or retrieving physical mail from General Delivery.

- **Post-Traumatic Stress Disorder, Depression, and Cognitive Processing Disorders:** Conditions requiring clear, written electronic communication and precluding management of complex paper-based systems.

- **Gender Dysphoria:** Medically diagnosed condition where misgendering triggers psychological distress, necessitating use of gender-neutral honorific "Mx."

- **Additional Anxiety and Phobic Disorders:** Including acrophobia, agoraphobia, aquaphobia, hoarding disorder, etc., which forms the basis of underlying discrimination claims.

2.     **Protected Status:** Plaintiff is a non-binary asylee who survives on

Supplemental Security Income (SSI), constituting Plaintiff's sole means of subsistence.

**B.    Defendants:**

**1.    SUPERIOR COURT OF CALIFORNIA, COUNTY OF EL DORADO:** A judicial branch entity of the State of California and a "public entity" under 42 U.S.C. § 12131(1)(B). Sued in its institutional capacity for its policies, customs, and practices.

**2.    CALIFORNIA COURT OF APPEAL, THIRD APPELLATE DISTRICT:** A judicial branch entity of the State of California and a "public entity" under 42 U.S.C. § 12131(1)(B). Sued in its institutional capacity for its policies, customs, and practices.

**V.    INSTITUTIONAL POLICIES AND PRACTICES**
**A. Plaintiff's Disability Accommodation Needs and Formal Requests**

Plaintiff's disabilities create specific, documented barriers to traditional court access. Required reasonable modifications include:

**1.    Electronic Filing and Service:** Necessary due to mobility limitations preventing physical court visits and cognitive disorders preventing management of paper systems.

**2.    Electronic Notice:** Required for time-sensitive materials due to inability to retrieve General Delivery mail.

**3.    Gender-Neutral Communication:** Use of "Mx." honorific to prevent

triggering gender dysphoria.

    **4.    Clear, Consistent Instructions and Deadline Flexibility:** Required due to cognitive processing disorders.

    These accommodations are consistent with California Rule of Court 1.100 and have been formally requested multiple times using Judicial Council Form MC-410, "Request for Accommodations by Persons with Disabilities." The institutional Defendants have systematically denied or ignored these requests through the policies described below.

    **B.    Institutional Policy 1: Validation of Inaccessible Service Methods**

    Defendants maintain practice of failing to ensure service of process is accessible to disabled *pro se* litigants, thereby enabling due process violations.

    **Manifestation:** In *Yakovlev v. Masters* (Case No. 25CV1460), the Superior Court accepted for filing and later relied upon motions filed July 17, 2025, that contained a "Proof of Service via email" to an address aleksummerfield@gmail.com to which Plaintiff never consented for service, violating California Code of Civil Procedure (CCP) § 1010.6(a)(2). Despite Plaintiff's documented cognitive disabilities and requests for accessible service, the Court's policy permitted these motions to form the basis for dismissal and sanctions without ensuring Plaintiff actually received them. This institutional practice of validating inaccessible service creates a two-tiered system where represented parties benefit from electronic service while disabled *pro se* litigants are subjected to service methods they cannot access.

**Consequence:** The Court used these un-received motions as the foundation for a September 12, 2025 order dismissing the case with prejudice and imposing $20,880.50 in sanctions. This practice fails the constitutional requirement that notice be reasonably calculated to apprise interested parties of the pendency of the action and afford an opportunity to be heard.

### C.    Institutional Policy 2: Automated Rejection of Disability Accommodation Requests

Both Defendants maintain policies and practices that deny individualized consideration of disability accommodation needs, including reliance on templated orders issued without engaging in the ADA-required interactive process.

**Superior Court Manifestation:** On October 7, 2025, the Court's e-filing system rejected Plaintiff's formal "Request for Reasonable Disability Accommodations" (Form MC-410) (Exhibit E-3, F. "Envelope 25ED00053539"), marking it "Document is defective." This automated categorization demonstrates an institutional policy of screening out disability accommodations through technical rejection rather than substantive engagement.

**Court of Appeal Manifestation:** The Court of Appeal's December 10, 2025 order in Case C105047 (Exhibit R, "C105047 - Order 12-10-25") illustrates this policy's circular nature: it prospectively granted electronic communication while denying *nunc pro tunc* relief for deadlines missed due to the lack of such communication, citing California Rule of Court 1.100(d) which prohibits discussing

merits in accommodation requests. This creates an institutional Catch-22: a litigant cannot argue in an accommodation request that the *need* for the accommodation caused the procedural default.

**Legal Violation:** This policy violates 28 C.F.R. § 35.130(b)(7), which requires public entities to make reasonable modifications and engage in an interactive process. By automating the rejection of accommodation requests, Defendants have institutionally refused to fulfill this federal mandate.

### D.    Institutional Policy 3: Discriminatory Notice Administration

The Court of Appeal maintains a two-tiered notice system that provides superior electronic service to represented parties while consigning disabled *pro se* litigants to inaccessible physical mail.

**Documented Implementation of Discriminatory Notice:** The Court of Appeal's own e-notice log for Case C105047 (Exhibit R, "C105047 CV Letter LTS Yakovlev 12-5-25") irrefutably documents a discriminatory, two-tiered notification system. On November 17, 2025, the Court sent a critical deadline letter via **email to opposing counsel** at his professional law firm address while simultaneously sending it only via **physical mail to Plaintiff** at an inaccessible "General Delivery" address. This institutional choice to deny Plaintiff efficient electronic service—despite possessing Plaintiff's valid email address from prior filings and knowledge of Plaintiff's documented mobility disabilities—reflects a systemic practice, not an isolated error. The discrimination is compounded by the letter's use of "Mr.

Yakovlev," a willful disregard of Plaintiff's non-binary identity and requested "Mx." honorific, which signals an institutional refusal to acknowledge Plaintiff's fundamental personhood and confirms the Court's failure to conduct even a cursory review of the case file.

**Engineered Default:** Plaintiff received this letter via email on December 5, 2025—after the November 24 deadline had passed (Exhibit R, "Gmail - REQUEST FOR CLARIFICATION Case C105047"). The Court then dismissed the appeal on December 3, 2025 (Exhibit R, "C105047 CV Letter LTS Yakovlev 12-5-25"), for missing this deadline. This sequence demonstrates how the institutional notice policy functions as a trap: it provides notice in a manner calculated not to reach disabled litigants, then penalizes them for failing to respond.

**Equal Protection Violation:** This policy treats disabled *pro se* litigants differently than represented parties without rational basis, violating the Equal Protection Clause's guarantee of uniform treatment under law.

### E.    Institutional Policy 4: Non-Individualized, Automated Adjudication

The Court of Appeal employs systems and practices that replace individualized judicial review with templated, automated decisions, particularly for disability-related requests and appeals from disabled litigants.

**Template Order Evidence:** On November 21, 2025, the Court issued six substantively identical orders across three unrelated appeals (C104874, C104875, and C104876) (Exhibit R, "Gmail - Servicing Notification," "Extension - DENIED -

SECOND AMENDED COMPLAINT FOR VIOLATIONS OF TITLE II OF THE ADA AND THE DUE PROCESS
AND EQUAL PROTECTION CLAUSES OF THE FOURTEENTH AMENDMENT

EXTENSION OF TIME"). Each order contained identical boilerplate language and—most tellingly—erroneously listed the captions of all three unrelated cases. This demonstrates batch processing rather than case-specific review.

**Automated "Merit" Determinations:** On December 2-4, 2025, the Court issued orders denying reinstatement of appeals using identical language across multiple cases: "Appellant has failed to show 'it appears that the litigation [the appeal] has merit.'" (Exhibit R, "C104874 - Order - ORDER ON REHEARING DUE", "C104875 - Order - ORDER DENYING REHEARING", "C104876 - Order - ORDER DENYING REHEARING") The simultaneous issuance of these identical determinations for cases involving different respondents (a community college, housing developer/owner, In-Home Supportive Services (IHSS), and private individuals) and different factual claims shows *pro forma* processing that precludes genuine consideration of disability discrimination arguments.

**ADA Violation:** This policy violates the ADA's requirement for an "individualized inquiry" into accommodation needs. *Wong v. Regents of Univ. of Cal.*, 192 F.3d 807, 818 (9th Cir. 1999). By applying template denials, the institution refuses to consider the unique ways Plaintiff's disabilities affect court access.

**F.    Institutional Policy 5: Circular Filing Requirements ("Catch-22")**

The Superior Court enforces vexatious litigant prefiling requirements in a manner that creates logically impossible barriers for disabled litigants.

**Documented Implementation:** On September 12, 2025, the Court rejected

Plaintiff's filing with this notation: "Plaintiff is a vexatious litigant subject to a prefiling order under CCP § 391.7, subd. (a). To date, no prefiling order has been submitted." (Exhibit J, "Envelope 25ED00051363")

This creates an institutional Catch-22: the Court demands a prefiling order for any filing, but the request for that prefiling order is itself a filing that gets rejected for lacking the order. For disabled litigants who require accommodations to navigate this process, the circularity becomes an absolute bar.

**Due Process Violation:** This policy operates as a permanent denial of access without a hearing on the merits of the underlying claims. It violates due process by making the exercise of the right to petition contingent on overcoming an impossible procedural hurdle.

### G.      Institutional Policy 6: Adjudication Based on Procedural Impossibility & Constructive Denial of Notice

The Superior Court enforces a policy of entering dispositive orders based on legal impossibilities and "secret" evidence, then insulating those void orders from review through circular filing barriers.

**Manifestation – The *Yakovlev v. Masters* (25CV1460) Fraud:**

**1.      The Constructive Denial of Notice:** On **July 17, 2025**, Defendant Marchita Masters filed a **combined Motion to Dismiss and Motion for Sanctions** in *Yakovlev v. Masters* (Case No. 25CV1460). This combined motion was **procedurally defective** and **should have been rejected** by the court for the following reasons:

- **Lack of Safe Harbor Compliance:** Under **CCP §§ 128.5 and 128.7**, a motion for sanctions **cannot be filed without first providing a 21-day safe harbor period** to allow the opposing party to withdraw the allegedly sanctionable conduct. Defendant **failed to comply with this requirement**, as the **July 15, 2025 meet-and-confer letter did not cite §§ 128.5 or 128.7** or provide the required safe harbor period (Exhibit M, "25CV1460 Motion for Sanctions").

- **Premature Filing**: The motion for sanctions was **filed just two days after the meet-and-confer letter** (on July 17, 2025), **violating the 21-day safe harbor requirement** and rendering the motion **premature and procedurally defective** (Exhibit M, "25CV1460 Motion for Sanctions").

- **Combined Motion:** The Motion to Dismiss was improperly combined with the Motion for Sanctions, creating a procedural trap for Plaintiff. California Code of Civil Procedure § 128.7(c)(1) requires that a motion for sanctions "shall be made separately from other motions or requests." Combining it with a motion to dismiss is a direct violation of this statutory mandate. Furthermore, it renders the sanctions portion premature and procedurally defective, as the mandatory 21-day safe harbor period under § 128.7(c)(1) cannot be honored when judicial action on the combined dismissal is sought immediately. The Motion to Dismiss should have been served separately and was never provided to Plaintiff as a standalone document.

- **Lack of Evidence of Frivolous Filing:** The motion **lacked any evidence** that Plaintiff's filing was frivolous or made in bad faith. Instead, it relied on

1    **Plaintiff's disability-related difficulties** as a pretext for sanctions.

2        2.      The dispositive orders of September 12, 2025, are the product of a

3    single, procedurally defective combined motion filed on July 17, 2025. This

4    combined "Motion for Sanctions and to Dismiss" violated California law in three

5    critical ways: (1) it failed to provide the mandatory 21-day safe harbor period for

6    sanctions motions under CCP §§ 128.5 and 128.7; (2) it was served via email to an

7    address aleksummerfield@gmail.com to which Plaintiff never consented for service,

8    in violation of § 1010.6; and (3) Plaintiff never received this defective motion via

9    email from Defendant. The Court nevertheless accepted the filing and, on September

10   12, 2025, issued two signed orders—one granting dismissal with prejudice and one

11   granting sanctions—adjudicating the defective motion as if it were two separate,

12   proper filings. By granting relief based on a motion that was void for noncompliance

13   with statutory prerequisites and constructive lack of service, the Court's September

14   12 orders are void *ab initio*.

15       3.      **The Adjudication on a Secret Record:** Despite Plaintiff filing an

16   opposition addressing the motion they had not even received and objecting to the lack

17   of service, the Superior Court, on September 12, 2025, granted the **combined**

18   **motions**. The Court's Tentative Ruling explicitly dismissed Plaintiff's arguments as

19   "unpersuasive" and noted Plaintiff "did not file an opposition brief expressly directed

20   to the motion to dismiss" (Exhibit M, "Tentative Rulings 9-12-25").

21       4.      **The Procedural Impossibility:** The Court's dismissal was predicated

on Plaintiff's failure to obtain a prefiling order (VL-115) under CCP § 391.7.

**5.    Conclusive    evidence    now    shows    this    was    a    legal impossibility:** Plaintiff's first "Request to File New Litigation" (VL-110) for this very case was filed in **October 2025**—weeks *after* the Court's September dismissal and denied on November 5, 2025 (Exhibit M, "25CV1460 Order VL-115"). The Court thus punished Plaintiff for failing to complete a statutory process that, by the Court's own docket, **had not yet been initiated**.

**6.    The Institutional Ratification:** This sequence—validating defective service, adjudicating an unseen motion, and ruling based on a factual impossibility—demonstrates a policy whereby the Court's procedures are weaponized to manufacture "defaults" against disabled *pro se* litigants. The subsequent use of the "vexatious litigant" label then blocks any filing to expose and correct this fraud.

**Harm:** This policy is the ultimate replication of Plaintiff's core trauma: the issuance of a catastrophic, punitive order based on a hidden process and false factual premises, followed by the system's absolute refusal to examine its own error. It guarantees that disability-driven difficulties with procedure will be converted into conclusive evidence of bad faith.

**H.    Institutional Policy 7: Refusal to Acknowledge Distinct Identity and Correct Fraud**

**1.    The Core Identity Fraud:** Plaintiff's legal existence in the United States began with asylum approval on October 13, 2016. Prior to that date, Plaintiff

was undocumented and could not have engaged in litigation without risking immediate deportation. Despite this documented timeline, both Defendants have systematically applied a 2009 San Francisco vexatious litigant prefiling order—issued against "Alex Yakovlev"—to Plaintiff, who is a different person with a distinct legal identity that post-dates the 2009 order by seven years. This identity misapplication is not an error but an institutional policy of refusing to verify identity before imposing severe restrictions.

2. **Systematic Concealment Through Filing Obstruction:** To prevent exposure of this identity fraud and the void nature of the underlying September 12, 2025 orders, the Superior Court implemented a dual-track obstruction policy documented in Plaintiff's December 5, 2025 Emergency Motion (Exhibit S):

a. **Improper Rejections:** The Court rejected Plaintiff's Notice of Appeal filings using legally invalid reasons including "case has been dismissed with prejudice" and vague "document is defective" notations.

b. **Indefinite Stalling:** Seven separate filing envelopes were left in "Submitted" status for 36 to 76 days—far beyond the 72-hour processing standard—ensuring the appellate timeline would expire.

c. **Evidence Tampering:** One envelope (25ED00053127) shows "NO DOCUMENTS LISTED"—a technical impossibility indicating post-submission tampering to conceal filed documents.

3. **The Court of Appeal's Complicity in the Fraud**: Rather than address

the meritorious claims in Plaintiff's December 5, 2025 Emergency Motion—which

included:

- Proof of distinct identity (asylum approval October 2016)

- Evidence of forged service in the underlying case

- Documentation of ADA violations

- Record of the filing obstruction pattern

The Court of Appeal issued a one-sentence denial on December 17, 2025:

"Appellant's 'Emergency Motion for Recognition of Distinct Identity, Relief from

Improper Rejections, and for Judicial Review of Void Orders' is denied."

**4.    Pattern of Evasion:** The December 17, 2025 denial exemplifies the

institutional policy of non-engagement with substantive disability and due process

claims. The Court refused to:

**a.** Acknowledge Plaintiff's distinct identity despite documentary proof.

**b.** Address the systematic filing rejections that blocked appellate review.

**c.** Review the void orders obtained through fraudulent service.

**d.** Consider the ADA violations in service methods.

This blanket refusal demonstrates that the institution prioritizes administrative

closure over constitutional and statutory compliance.

**5.    The Catch-22 of Identity Verification:** Defendants have created an

impossible barrier: they apply the 2009 order to Plaintiff based on name similarity

alone, but when Plaintiff provides documentation proving distinct identity (asylum

approval, SSN issuance documents), they refuse to review it. This circular logic—applying restrictions without verification, then refusing verification when challenged—mirrors the procedural Catch-22s in filing and constitutes deliberate indifference to due process.

**6.      Compounding Harms:** This identity misapplication triggers Plaintiff's trauma-based disabilities, as it replicates the original immigration fraud where authorities made life-altering decisions based on false assumptions without reviewing evidence. The institutional refusal to correct this error—even when presented with conclusive proof—demonstrates a policy of willful blindness that violates both the ADA and fundamental fairness.

**I.      Institutional Policy 8: Refusal to Acknowledge Non-Binary Status as Disability Discrimination**

**1.      Deliberate Misgendering as Policy:** Both Defendants maintain institutional practices that refuse to acknowledge Plaintiff's non-binary gender identity, despite formal requests and documented medical necessity. This refusal constitutes direct discrimination under the ADA, as gender dysphoria is a recognized disability requiring reasonable accommodation.

**2.      Court of Appeal's Pattern of Disability Discrimination:**

**a. Refusal of Honorific Accommodation:** In Plaintiff's December 5, 2025 Emergency Motion, filed with the Court of Appeal, Plaintiff expressly requested "Recognition of Distinct Identity" and use of the honorific "Mx."—a medically

necessary accommodation to prevent severe psychological distress from misgendering. The Court's December 17, 2025 one-sentence denial refused this accommodation without justification.

**b. Continuing Misgendering in Orders**: Despite Plaintiff's repeated corrections and formal accommodation requests, the Court of Appeal continues to use male-gendered language ("Appellant," "he/him") in its orders. This is not incidental but reflects an institutional policy of disregarding disability-related accommodation needs.

**c. Hostile Judicial Environment:** The Court's refusal to use Plaintiff's correct honorific, while granting all conventional honorifics to other parties, creates a hostile environment that signals Plaintiff's disability is not legitimate and will not be accommodated.

**3.    Medical Necessity of Gender-Affirming Language**: Plaintiff's gender dysphoria is a medically diagnosed condition under the DSM-5. Being misgendered triggers severe psychological distress, dissociation, panic attacks, and exacerbation of comorbid PTSD and depression. The accommodation request for "Mx." is not a preference but a medical necessity to ensure Plaintiff can participate meaningfully in court proceedings without being re-traumatized.

**4.    ADA Violation Through Refusal to Accommodate**: The Court of Appeal's denial of Plaintiff's request violates:

**a. 28 C.F.R. § 35.130(b)(7)**: Failure to make reasonable modifications to

policies when necessary to avoid discrimination.

**b. 28 C.F.R. § 35.130(b)(1)(ii)**: Subjecting Plaintiff to different rules of participation based on disability.

**c. 28 C.F.R. § 35.160**: Failure to provide appropriate auxiliary aids and services for effective communication.

5.     **Deliberate Indifference to Disability**: The Court of Appeal had actual knowledge of Plaintiff's gender dysphoria diagnosis and accommodation needs through:

- Formal ADA accommodation requests (Form MC-410).

- Direct requests in pleadings and motions.

- Medical documentation submitted with filings

Despite this knowledge, the institution maintains a policy of refusing gender-affirming accommodations, demonstrating deliberate indifference to federally protected rights.

6.     **Connection to Larger Discriminatory Pattern**: This refusal to accommodate gender identity is part of the same institutional mindset that:

- Refuses to verify Plaintiff's distinct legal identity

- Uses automated systems to reject disability accommodation requests as "defective"

- Implements discriminatory notice schemes

- Issues template denials without individualized review

Each component reinforces the message that Plaintiff's disabilities are irrelevant to the institution, and accommodations will be systematically denied.

7. **Compounding Harm**: Every instance of misgendering by the Court of Appeal re-traumatizes Plaintiff, triggering flashbacks to previous institutional invalidations (including the wrongful asylum denial and detention) and causing measurable medical harm. The Court's refusal to use "Mx." is not merely disrespectful—it is medically harmful disability discrimination that actively prevents Plaintiff from accessing the courts on equal terms.

## VI. HARM CAUSED BY INSTITUTIONAL POLICIES
### A. Loss of Fundamental Rights

Defendants' policies have permanently blocked Plaintiff from appealing four cases involving severe disability discrimination:

1. **Housing Discrimination (25CV1718):** Eviction from disabled housing after refusal to accommodate hoarding disorder and hostile environment.

2. **Education Discrimination (25CV1332):** Expulsion from Lake Tahoe Community College due to manifestations of acrophobia, reported antisemitism, bulling, received injuries during the outdoor class, etc.

3. **Public Benefits Fraud (25CV1748):** Retaliation for reporting fraudulent IHSS contracts and stolen public funds.

4. **Benefits Termination Attempt (25CV1460):** Efforts to terminate SSI

benefits based on false allegations of "faking" disability, threatening Plaintiff's asylum status with following deportation to indefinite immigration detention (Exhibit I, "Surgery 7-13-21 (1) malingering 6/03/2021"; Exhibit H, "Barton Marchita Addendums").

These cases cannot now be appealed due to Defendants' institutional barriers, effectively immunizing third-party discriminators from judicial review.

**B.      Severe Medical and Psychological Injury**

The stress of navigating an inaccessible judicial system has caused documented medical harm:

**1.**      Psychiatric hospitalization for suicidal ideation (July 23, 2024)  (Exhibit I, "ER 7-23-24")

**2.**      Emergency hospitalization on September 13, 2025, for abdominal pain, vomiting, and acute anxiety directly attributed by medical personnel to the September 12 court hearing (Exhibit I, "ER 9-13-25").

**3.**      Collapsed lung (pneumothorax) induced by court-related anxiety (Exhibit I, "Surgery 7-13-21").

**4.**      Development of new disabling conditions, including aquaphobia.

**5.**      Severe exacerbation of baseline PTSD, depression, and gender dysphoria.

**C.      Imminent Existential Threat Anchored in a Fraudulent Judgment**

The **$20,880.50 sanctions order** in *Yakovlev v. Masters* (25CV1460) (Exhibit

D, "25CV1460 Order and Motion for Sanctions") is not a legitimate debt but the **direct product of the institutional fraud** described in Policy 6. This sanction was imposed concurrently with a **void dismissal order** that was itself granted on a motion Plaintiff never received, based on a prefiling requirement that was a legal impossibility at the time. Defendants' policies of automated rejection, discriminatory notice, and refusal of accommodations are now actively preventing Plaintiff from challenging this fraudulent judgment in any state forum. The imminent garnishment of Plaintiff's SSI benefits—which would cause immediate homelessness, starvation, medical crisis, and death—is therefore a direct and intended consequence of Defendants' policies that deny access to correct fundamental judicial errors.

## VII.  CLAIMS FOR RELIEF
### A. COUNT I: VIOLATION OF TITLE II OF THE AMERICANS WITH DISABILITIES ACT (42 U.S.C. § 12132 – Against All Defendants)

1.    Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

2.    Defendants are "public entities" under 42 U.S.C. § 12131(1).

3.    Plaintiff is a "qualified individual with a disability" under 42 U.S.C. § 12131(2).

4.    Defendants have excluded Plaintiff from participation in, denied Plaintiff the benefits of, and subjected Plaintiff to discrimination in court services, programs, and activities by reason of disability.

Defendants **violated Title II of the ADA** by:

- **Granting a combined Motion to Dismiss and Motion for Sanctions** that was **procedurally defective** due to **lack of safe harbor compliance** and **premature filing**.

- **Failing to serve Plaintiff with the Motion to Dismiss as a standalone document**, instead serving it **only as part of a combined motion** to an email address aleksummerfield@gmail.com (Exhibits D, M) to which Plaintiff **never consented**, in violation of **28 C.F.R. § 35.160** (effective communication).

- **Dismissing Plaintiff's case based on Plaintiff's disability-related difficulties** (requests for accommodations due to trauma), in violation of **28 C.F.R. § 35.130(b)(7)** (reasonable modifications).

- **Using Plaintiff's disabilities as a pretext for sanctions**, thereby **denying Plaintiff equal access to the courts**.

5. **Specific Institutional Violations**:

**a. Discriminatory Administration (28 C.F.R. § 35.130(b)(3)):** Defendants' policies—including automated rejection of accommodation requests, discriminatory notice schemes, and template adjudication—have the purpose and effect of defeating court access objectives for disabled individuals.

**b. Failure to Make Reasonable Modifications (28 C.F.R. § 35.130(b)(7)):** Defendants institutionally refused to modify policies regarding electronic filing, gender-neutral communication, and notice methods when such modifications were necessary to avoid discrimination.

**c. Failure to Provide Effective Communication (28 C.F.R. § 35.160):** Defendants failed to provide appropriate auxiliary aids (electronic communication) necessary for equally effective participation.

**d. Failure to Provide Integrated Services:** Defendants afforded Plaintiff an opportunity to participate in judicial services that was not equal to that afforded others, violating Title II's integration mandate.

**e. Deliberate Indifference:** Defendants had actual knowledge of Plaintiff's disabilities and accommodation needs through repeated MC-410 filings and court communications, yet maintained policies with deliberate disregard for their discriminatory effects.

**f. Failure to Verify Identity Before Imposing Restrictions:** Defendants applied severe litigation restrictions based on mistaken identity, refused to review documentary proof of distinct identity, and thereby discriminated against Plaintiff by subjecting them to procedures from which they were legally exempt.

**g. Failure to Accommodate Gender Dysphoria:** Defendants refused Plaintiff's medically necessary accommodation request for use of the gender-neutral honorific "Mx.," despite knowledge of Plaintiff's gender dysphoria diagnosis. This refusal subjects Plaintiff to severe psychological distress and denies meaningful participation in court proceedings, in violation of 28 C.F.R. §§ 35.130(b)(7) and 35.160.

**6.** These violations are ongoing and continue to deny Plaintiff access to

court services.

**B.    COUNT II: DEPRIVATION OF DUE PROCESS UNDER THE FOURTEENTH AMENDMENT (Pursuant to 42 U.S.C. § 1983 – Against All Defendants)**

7.    Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

8.    The right to meaningful access to the courts is a protected liberty interest under the Due Process Clause. *Tennessee v. Lane*, 541 U.S. at 523.

9.    Defendants, acting under color of state law through their institutional policies, deprived Plaintiff of this interest through fundamentally unfair procedures.

Defendants **violated Plaintiff's due process rights** by:

- **Granting a combined Motion to Dismiss and Motion for Sanctions** that was **procedurally defective** due to **lack of safe harbor compliance** and **premature filing**, in violation of **CCP §§ 128.5 and 128.7**.

- **Serving the combined motion to an unverified email address** aleksummerfield@gmail.com, to which Plaintiff **never consented**, in violation of **CCP § 1010.6(a)(2)** and the **Due Process Clause**.

- **Dismissing Plaintiff's case with prejudice** based on a **void motion** that Plaintiff **never properly received**, thereby denying Plaintiff a **meaningful opportunity to be heard** (*Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950)).

- **Using Plaintiff's disability-related difficulties** (requests for accommodations) as a **pretext for sanctions**, in violation of the **Due Process Clause**.

**10.    Unconstitutional Institutional Procedures:**

**a. Constructive Denial of Notice:** The Court of Appeal's policy of mailing critical notices to inaccessible addresses while emailing opposing counsel rendered any opportunity to be heard illusory (Exhibit R, "C105047 CV Letter LTS Yakovlev 12-5-25"). Notice must be "reasonably calculated" to reach interested parties. *Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 14–15 (1978).

**b. Impossible Procedural Barriers:** The Superior Court's Catch-22 prefiling order policy arbitrarily and permanently bars court access without a hearing on the merits, violating due process.

**c. Reliance on Fraudulently Served Documents:** The Superior Court's policy of validating and relying upon inaccessible service denied Plaintiff any opportunity to respond to dispositive motions, constituting a secret proceeding.

**d. Automated Adjudication Without Hearing:** The Court of Appeal's template order system denies individualized consideration, effectively removing the "hearing" from due process.

**e. Adjudication Based on Secret Motions and Constructive Denial of Notice:** The Superior Court's policy of granting motions that were not effectively served—and then deeming the unserved party's response inadequate—constitutes a quintessential due process violation. It transforms a court proceeding into a *fait accompli*, where the disabled litigant is punished for failing to rebut unseen accusations. This practice of "trial by ambush" is fundamentally unfair and violates

the most basic guarantee of notice and an opportunity to be heard. *Covey v. Town of Somers*, 351 U.S. 141, 146 (1956) ("The right to be heard before being condemned to suffer grievous loss of [property] is a principle basic to our society.").

11. These procedures are fundamentally unfair and violate due process.

**C.    COUNT III: VIOLATION OF THE EQUAL PROTECTION CLAUSE OF THE FOURTEENTH AMENDMENT (Pursuant to 42 U.S.C. § 1983 – Against All Defendants)**

13. Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

14. Defendants' institutional policies intentionally treat disabled *pro se* litigants differently than represented parties and differently than litigants whose gender identity conforms to binary norms.

15. This differential treatment is based on Plaintiff's disabilities and non-binary gender identity. It constitutes intentional discrimination that cannot survive rational basis review, as the discriminatory policies—such as providing electronic notice to attorneys while consigning disabled *pro se* litigants to inaccessible mail—serve no legitimate government interest and are arbitrary and irrational.

16. **Evidence of Discriminatory Treatment:**

**a. Two-Tiered Notice System:** Providing electronic notice to attorneys while forcing disabled *pro se* litigants to use inaccessible mail.

**b. Accommodation Denial:** Systematically rejecting disability accommodation requests that would be unnecessary for non-disabled litigants.

**c. Gender Discrimination:** Institutional refusal to use requested honorifics

while consistently using conventional honorifics for others.

**d. Intentional Discrimination Based on Gender Identity:** Defendants' persistent refusal to use Plaintiff's correct honorific while using conventional honorifics for all other parties constitutes intentional discrimination based on gender identity, violating the Equal Protection Clause's guarantee of equal treatment under law.

17.    Defendants' policies are not rationally related to any legitimate state interest. The denial of electronic access, refusal of gender-neutral communication, and use of trap-like procedures serve no administrative efficiency, judicial economy, or security interest.

18.    These policies constitute intentional discrimination in violation of the Equal Protection Clause.

## VIII.  PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff respectfully requests that this Court grant the following relief:

### A. DECLARATORY JUDGMENT

1.    **Declare** that the customs and practices of the Defendant courts, as administered by their officials, as alleged herein—including the use of inaccessible service, automated rejections of accommodation requests, discriminatory notice systems, and the misapplication of litigation restrictions without verification—violate Title II of the Americans with Disabilities Act (42 U.S.C. § 12132) and the Due

Process and Equal Protection Clauses of the Fourteenth Amendment.

**B.    INJUNCTIVE RELIEF**

**Issue a permanent injunction**, pursuant to the doctrine of *Ex Parte Young* and *Tennessee v. Lane*, to halt the ongoing violations of federal law by the officials of the Defendant courts and to afford Plaintiff meaningful access to the courts:

**C.    AS TO BOTH DEFENDANTS**

**2.    Enjoin** the judges, clerks, and all personnel of the Defendants' courts from:

**a.** Applying any vexatious litigant prefiling order or similar restriction to Plaintiff without first verifying Plaintiff's distinct legal identity against documentary proof.

**b.** Denying Plaintiff's reasonable accommodation requests made pursuant to Form MC-410 or clear written request.

**c.** Using male-gendered honorifics ("Mr.") or pronouns ("he/him") when referring to Plaintiff.

**3.    Enjoin** said officials to:

**a.** Provide all notices, orders, and service of process to Plaintiff via the email address 750emerealdbay@gmail.com.

**b.** Use the gender-neutral honorific "Mx." and the pronouns "they/them" for Plaintiff in all court communications, orders, and docket entries.

**c.** Engage in an interactive process with Plaintiff to determine and provide effective reasonable modifications for Plaintiff's documented disabilities, including electronic filing access where feasible.

**D.    AS TO DEFENDANT SUPERIOR COURT OF CALIFORNIA, COUNTY OF EL DORADO:**

**4.    Enjoin** the presiding judge and clerk of the Superior Court from enforcing the September 12, 2025 orders in *Yakovlev v. Masters* (25CV1460), and **remand** the matter for proceedings consistent with the ADA and Due Process, with instructions to:

**a.** Accept and substantively process Plaintiff's pending Request for Reasonable Disability Accommodations (Form MC-410).

**b.** Vacate any sanctions or dismissal orders predicated on Plaintiff's failure to comply with a prefiling order requirement that was a legal impossibility at the time of the court's ruling.

**E.    AS TO DEFENDANT CALIFORNIA COURT OF APPEAL, THIRD APPELLATE DISTRICT:**

**5.    Enjoin** the presiding justice and clerk of the Court of Appeal from enforcing the dismissal orders entered in December 2025 in Appeals C104874, C104875, C104876, and C105047, and **remand** those appeals with instructions to:

**a.** Toll all applicable deadlines pending the outcome of the remanded superior court action (*Yakovlev v. Masters*, 25CV1460).

**b.** Provide Plaintiff with an ADA-compliant opportunity to be heard on the

merits of said appeals upon conclusion of the remanded proceedings.

## F.    RETAINED JURISDICTION & ADDITIONAL RELIEF

**6.    Retain jurisdiction** over this matter for a period of thirty-six (36) months to monitor and ensure Defendants' compliance with all injunctive orders entered herein.

**7.    Grant** any other and further equitable relief the Court deems just and proper to remedy the denial of access alleged herein.

## IX.    JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable pursuant to Federal Rule of Civil Procedure 38.

DATED: December 18, 2025

Respectfully submitted,

*Alexandr Yakovlev*

**s/Alexandr Yakovlev/**
ALEXANDR YAKOVLEV
Plaintiff, Pro Se

## X.    VERIFICATION

I, Alexandr Yakovlev, declare under penalty of perjury under the laws of the United States of America that the foregoing Second Amended Complaint is true and correct.

Executed on December 18, 2025, at South Lake Tahoe, California.

*Alexandr Yakovlev*

**s/Alexandr Yakovlev/**
ALEXANDR YAKOVLEV
Plaintiff, Pro Se