Alexandr Yakovlev, Pro Se
General Delivery
South Lake Tahoe, CA 96151

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ALEXANDR YAKOVLEV,<br>Plaintiff,<br><br>v.<br><br>SUPERIOR COURT OF CALIFORNIA, COUNTY OF EL DORADO; and CALIFORNIA COURT OF APPEAL, THIRD APPELLATE DISTRICT,<br>Defendants. | **Case No.:** 2:25-cv-03110-DJC-CSK<br><br>**THIRD AMENDED COMPLAINT FOR VIOLATIONS OF TITLE II OF THE AMERICANS WITH DISABILITIES ACT**<br><br>**SUPPORTED BY EXHIBITS A-T** |

## PRELIMINARY STATEMENT REGARDING SERVICE, ACCESSIBILITY, AND TIMELINESS

Plaintiff respectfully submits this preliminary statement to establish that this Third Amended Complaint is timely filed due to improper service of the Court's December 1, 2025 Findings and Recommendations and the need for reasonable accommodation under the Americans with Disabilities Act.

**Failure of Mail Service**

**1.** The Court's December 1, 2025 Findings and Recommendations were never properly served on Plaintiff via mail as required by Federal Rule of Civil Procedure 72(b)(2). Despite the docket indicating "served by mail" on December 2, 2025, Plaintiff never received this critical document at the General Delivery address

listed in the case record.

**2.** This failure of mail service is not incidental but part of a pattern of discriminatory notice practices that Plaintiff challenges in this action. See *Tennessee v. Lane*, 541 U.S. 509, 533-34 (2004) (access to courts is fundamental right protected by ADA); 28 C.F.R. § 35.130(b)(1)(ii) (prohibiting policies with discriminatory effect). As documented in the accompanying Third Amended Complaint, Defendants systematically provide electronic notice to represented parties while consigning disabled pro se litigants to unreliable physical mail service, creating barriers to meaningful participation in federal court proceedings.

### Inaccessibility of Electronic Court Records Due to Disability

**3.** Plaintiff has been unable to access the Court's electronic filing system (PACER/ECF) to monitor the docket or review electronically filed documents due to specific disability-related barriers:

**4.** **Dyslexia and Cognitive Processing Disorders**: Plaintiff has documented dyslexia that makes reading standard legal text extremely difficult without assistive technology. The complex legal language in court documents requires text-to-speech software that can read documents aloud while simultaneously displaying them, allowing Plaintiff to process information through both auditory and visual channels. The need for text-to-speech technology as a reasonable accommodation for dyslexia is well-established. See *Baughman v. Walt Disney World Co.,* 685 F. Supp. 2d 1271,

1281 (M.D. Fla. 2010) (assistive technology required for dyslexic employees); 28 C.F.R. § 35.160(a)(1); (requirement for auxiliary aids).

**5.    Limited English Proficiency:** As someone who received asylum after fleeing persecution, English is Plaintiff's second language. Court documents contain specialized legal terminology that requires translation assistance and contextual explanation that standard screen readers cannot provide. Courts must accommodate limited English proficiency as part of ensuring meaningful access. See *Lau v. Nichols,* 414 U.S. 563, 568-69 (1974) (holding that language barriers require accommodation under Title VI, a principle applied analogously under the ADA).

**6.    Inaccessible Document Formats:** The PDF documents submitted through the electronic system are not compatible with Plaintiff's assistive technology. They cannot be:

- Read aloud by text-to-speech software due to formatting barriers

- Translated using assistive translation programs

- Processed through the dual audio-visual system Plaintiff requires for comprehension

**Technological Barriers and PTSD Triggers**

**7.    The electronic court system interface itself creates accessibility barriers:

- Complex navigation menus that are incomprehensible to someone with cognitive processing disorders

- Visual layouts that trigger PTSD responses related to prior institutional surveillance

- Authentication processes that require multi-step procedures Plaintiff cannot complete without assistance

**8.** These technological barriers are not mere inconveniences but fundamental obstacles that prevent meaningful access to court records that non-disabled litigants can freely access.

**Constructive Service on December 15, 2025**

**9.** Plaintiff only obtained the Findings and Recommendations on December 15, 2025, during a court visit initiated by Plaintiff to file a supplemental memorandum with exhibits. At that time, the clerk handed Plaintiff a copy of the Findings and Recommendations and the Order Allowing Electronic Filing.

**10.** This December 15, 2025 date constitutes the operative service date for purposes of calculating deadlines, as mail service failed completely and electronic access was impossible due to disability-related barriers. Federal Rule of Civil Procedure 6(b)(1)(B) permits enlargement of time for excusable neglect; service of the Findings and Recommendations is governed by Rule 5(b)(2). See *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 392 (1993) (excusable neglect includes circumstances beyond party's control); *Ahanchian v. Xenon Pictures, Inc.,* 624 F.3d 1253, 1261-62 (9th Cir. 2010) (applying equitable factors for excusable

neglect flexibly to favor disposition on the merits).

**Required Accommodation for Document Processing**

**11.** Due to Plaintiff's specific disabilities, processing legal documents requires:

- **Text-to-speech technology** that can read complex legal language aloud while displaying text

- **Translation assistance** for specialized legal terminology and procedural language

- **Extended time** to comprehend multi-layered legal analysis that dyslexia makes difficult to process

- **Audio-visual dual processing** that allows simultaneous listening and reading for comprehension

**12.** The Findings and Recommendations contain complex legal analysis that required extensive processing time. Plaintiff's disabilities make it impossible to quickly scan and comprehend such documents without assistive technology and extended review periods.

**Disability-Related Barriers to Timely Filing**

**13.** Plaintiff's documented disabilities create unique barriers to timely court participation:

- **Dyslexia** requires assistive technology for reading comprehension that

was unavailable until documents were physically obtained

- **Limited English Proficiency** necessitates translation support for complex legal terminology

- **Cognitive processing disorders** require extended time to understand procedural requirements and legal implications

- **PTSD triggered by procedural systems** that issue rejections without review, creating incapacitating responses to unexpected deadlines

14.    These disabilities are not mere inconveniences but substantial limitations that directly impact the ability to navigate court procedures without reasonable accommodations, as established in Plaintiff's Social Security Administration disability determination and supporting medical documentation.

**Request for Reasonable Accommodation and Excusable Neglect**

15.    Pursuant to the Americans with Disabilities Act, 42 U.S.C. § 12132, and Federal Rule of Civil Procedure 6(b)(1)(B), Plaintiff requests that this Court:

- Recognize December 15, 2025 as the operative service date for the Findings and Recommendations

- Find that the delay in filing this Third Amended Complaint constitutes excusable neglect due to disability-related barriers

- Approve this filing as a reasonable accommodation necessary to ensure meaningful access to the courts

**16.** The delay from December 15, 2025 to the filing date is reasonable given:

• The complete failure of mail service

• The inaccessibility of electronic court records due to dyslexia and language barriers

• The need for assistive technology to process complex legal documents

• The extended time required for comprehension due to cognitive disabilities

• The complexity of the Findings and Recommendations requiring careful analysis

**No Prejudice to Defendants**

**17.** There is no prejudice to Defendants from this delay. The requested relief is prospective injunctive relief that does not become more burdensome with time. If anything, the delay demonstrates the urgent need for the accommodations Plaintiff seeks, as the same barriers that prevented timely filing continue to block meaningful access to the courts.

**Consistency with ADA Obligations**

**18.** Federal courts have independent obligations under the Americans with Disabilities Act to provide reasonable accommodations that ensure meaningful access to judicial proceedings. See 28 C.F.R. § 35.130(b)(7) (requirement to make reasonable modifications); *Phillips v. Judge of the Circuit Court*, 297 F. Supp. 3d 701, 708 (E.D.

Va. 2017) (courts must provide ADA accommodations). Requiring strict adherence to deadlines that were impossible to meet due to disability-related barriers would perpetuate the very discrimination Plaintiff seeks to remedy.

19. This request is consistent with numerous cases recognizing that disability-related delays constitute excusable neglect, particularly when court systems fail to provide accessible notice and accommodation procedures. See *Rodriguez v. Hayes*, No. 1:11-cv-01372-AWI, 2012 WL 1136442, at *3 (E.D. Cal. Apr. 12, 2012) (dyslexia and language barriers support excusable neglect finding); *Duvall v. County of Kitsap*, 260 F.3d 1124, 1136 (9th Cir. 2001) (ADA requires accessible procedures). The inability to access court records due to dyslexia and language barriers is a fundamental accessibility issue that requires accommodation.

**Conclusion**

20. For these reasons, Plaintiff respectfully submits that this Third Amended Complaint should be accepted as timely filed due to improper service and disability-related barriers to accessing court records. The requested accommodation is necessary to ensure meaningful participation in these proceedings and is consistent with both the letter and spirit of the Americans with Disabilities Act. See 42 U.S.C. § 12132; *Tennessee v. Lane*, 541 U.S. at 531 (ADA ensures 'meaningful access' to courts).

## I.   INTRODUCTION: INSTITUTIONAL BETRAYAL AND SYSTEMIC ADA VIOLATIONS

21. Plaintiff Alexandr Yakovlev brings this action under Title II of the

Americans with Disabilities Act (ADA), 42 U.S.C. § 12131 et seq., to halt Defendants' ongoing, institutionally embedded denial of meaningful access to judicial programs and services for qualified individuals with disabilities. Defendants are public entities that have systematically excluded Plaintiff from participation in court services, programs, and activities by reason of disability, in direct violation of federal law.

22.    Plaintiff is a disabled, non-binary asylee whose disabilities were forged through decades of institutional betrayal that began before Plaintiff's legal existence in the United States and continues through Defendants' current discriminatory practices. After fleeing persecution in Russia, Plaintiff was wrongfully denied asylum, rendered stateless, and imprisoned in immigration detention for six months under threat of permanent imprisonment. This traumatic saga directly caused severe Post-Traumatic Stress Disorder, cognitive processing disorders, fibromyalgia, gender dysphoria, and debilitating anxiety that substantially limit major life activities.

23.    Rather than accommodating these documented disabilities as required by federal law, Defendants have replicated the exact pattern of institutional betrayal that caused Plaintiff's trauma. Defendants deny Plaintiff access to the courts through eight interconnected institutional policies that systematically filter out disabled pro se litigants: (1) automated rejection of disability accommodation requests without individualized review; (2) discriminatory two-tiered notice systems providing electronic service to attorneys while denying it to disabled pro se litigants; (3)

concealment of dispositive motions from disabled litigants while ruling on them; (4) automated template adjudication without case-specific analysis; (5) circular procedural traps creating legally impossible catch-22s; (6) identity misapplication without verification; (7) refusal to acknowledge non-binary status and provide medically necessary gender-neutral communication; and (8) systematic filing obstruction to prevent correction of errors.

24.    These policies do not operate in isolation. They function as a coordinated system of exclusion, each component reinforcing the others to create an impenetrable procedural labyrinth that triggers Plaintiff's documented disabilities and renders court participation medically unsafe and substantively impossible. Defendants maintain these customs with deliberate indifference to federally protected rights, despite actual knowledge of Plaintiff's disabilities through repeated accommodation requests, medical documentation, and explicit court filings.

25.    The harm is ongoing, irreparable, and escalating to life-threatening proportions. Defendants' policies have permanently blocked Plaintiff from appealing four cases involving severe disability discrimination. An imminent $20,880.50 sanctions order—procured through the very ADA violations challenged here—threatens garnishment of Plaintiff's Supplemental Security Income, the sole source of subsistence preventing homelessness, medical abandonment, and psychiatric decompensation. Without federal intervention to enjoin these systemic violations,

Plaintiff faces fatal consequences directly caused by Defendants' refusal to provide meaningful access as required by the ADA.

## II.    JURISDICTION AND VENUE

26.    This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343(a)(3). This action arises under Title II of the Americans with Disabilities Act, 42 U.S.C. § 12132, which provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."

27.    Congress validly abrogated state sovereign immunity under Title II of the ADA for claims implicating the fundamental right of access to the courts. *Tennessee v. Lane*, 541 U.S. 509, 533-34 (2004). The Supreme Court held that "Title II, as it applies to the class of cases implicating the fundamental right of access to the courts, validly abrogates state sovereign immunity." The institutional policies challenged here— systematically blocking judicial access through inaccessible procedures—directly implicate this fundamental right.

28.    Plaintiff seeks only prospective declaratory and injunctive relief, consistent with the *Ex parte Young* doctrine, 209 U.S. 123 (1908), which permits suits against state officials in their official capacity to halt ongoing violations of federal law. The relief requested is prospective, non-monetary, and narrowly tailored to remedy

ongoing ADA violations.

29.    Venue is proper under 28 U.S.C. § 1391(b)(2). All Defendants are judicial branch entities located within the Eastern District of California, and the substantial events giving rise to these claims occurred within El Dorado County and the Third Appellate District's jurisdiction.

### III.    PARTIES

30.    Plaintiff Alexandr Yakovlev is a natural person residing in El Dorado County, California. Plaintiff is a "qualified individual with a disability" under 42 U.S.C. § 12131(2).

31.    Plaintiff's legal existence in the United States began with asylum approval on October 13, 2016. Prior to that date, Plaintiff was undocumented and could not have engaged in litigation without risking immediate deportation. All prior state court orders are legally inapplicable to Plaintiff's current identity.

32.    Plaintiff's disabilities are medically documented and administratively recognized. On August 11, 2023, the Social Security Administration issued a formal determination finding Plaintiff disabled under sections 216(i) and 223(d) of the Social Security Act, confirming eligibility for Supplemental Security Income based on documented disabilities including fibromyalgia, PTSD, cognitive processing disorders, and gender dysphoria.

33.    Defendant Superior Court of California, County of El Dorado is a judicial

THIRD AMENDED COMPLAINT FOR VIOLATIONS OF TITLE II OF THE ADA

branch entity of the State of California and a "public entity" under 42 U.S.C. § 12131(1)(B), sued in its institutional capacity for its policies, customs, and practices that deny meaningful access to disabled litigants.

34.     Defendant California Court of Appeal, Third Appellate District is a judicial branch entity of the State of California and a "public entity" under 42 U.S.C. § 12131(1)(B), sued in its institutional capacity for its policies, customs, and practices that deny meaningful access to disabled litigants.

## IV.    THE CREATION OF DISABILITY THROUGH INSTITUTIONAL TRAUMA

35.     Plaintiff's disabilities were not congenital but were forged by specific, prolonged institutional malfeasance that mirrors the pattern Defendants currently replicate. In 2013, Plaintiff sought asylum in the United States based on persecution due to gender identity, ethnicity, and political opinion. The immigration court wrongfully denied the application without reviewing submitted evidence, claiming Plaintiff remained a Russian citizen—a fact irrelevant to asylum eligibility and demonstrative of the system's reflexive disregard for evidence.

36.     Forced to return to Russia, Plaintiff discovered that Russian authorities had terminated Plaintiff's citizenship, rendering Plaintiff stateless. Upon returning to U.S. immigration authorities to seek review of this catastrophic error, Plaintiff was not heard. Instead, Plaintiff was imprisoned in immigration detention for six months. Officials repeatedly stated Plaintiff would be detained indefinitely—a "life

sentence"—because they could not deport Plaintiff to a country that no longer claimed Plaintiff.

37.     For six months, Plaintiff was held in immigration detention under threat of permanent imprisonment. During this period, Plaintiff experienced severe psychological and physical trauma, including sleep deprivation, sensory overload, rape attempts, and enforced isolation. These conditions directly precipitated the onset of chronic PTSD, anxiety and panic disorder, and gender dysphoria, as confirmed by subsequent clinical evaluations.

38.     In February 2016, the Board of Immigration Appeals reopened Plaintiff's case and remanded it to the San Francisco Immigration Court, which cancelled deportation proceedings and issued a court order requiring Plaintiff to apply for asylum. Despite Plaintiff's lack of Russian citizenship, the San Francisco Asylum Office denied asylum three times on the identical false ground that Plaintiff was a Russian citizen: (1) initial denial in 1998; (2) renewed denial in September 2016 citing the 1998 decision; and (3) second renewed denial in September 2016 claiming the 1998 denial precluded new applications. Each denial ignored Plaintiff's documented evidence that Russian citizenship had been terminated, making the original 1998 denial factually baseless. After Plaintiff contacted Washington headquarters to correct this systematic factual error, asylum was finally granted on October 13, 2016. This date marks Plaintiff's establishment of legal identity in the United States. All prior legal

incidents—including a 2009 vexatious litigant order against "Alex Yakovlev"—are legally inapplicable to Plaintiff's current identity as they predate Plaintiff's establishment of legal immigration status.

39.     The experience of being falsely rejected, rendered stateless, imprisoned without cause, and told detention was permanent directly caused the severe PTSD, depression, cognitive impairments, and acute procedural anxiety that substantially limit major life activities today. This history makes Plaintiff uniquely vulnerable to, and uniquely harmed by, government systems that issue rote rejections without reviewing the file—the precise pattern exhibited by Defendants.

40.     The immigration judge's order of voluntary departure was impossible to execute because Plaintiff lacked both citizenship and travel documents after Russia terminated citizenship. When Plaintiff could not comply with this impossible order, ICE arrested and detained Plaintiff for "failure to follow judge's order"—punishing Plaintiff for being unable to complete a legal impossibility. The San Francisco Asylum Office then repeated this pattern, denying asylum three times on the false "Russian citizen" ground despite documentary proof of citizenship termination, creating a traumatic feedback loop where each rejection without file review triggers incapacitating anxiety.

41.     For eighteen years following the false asylum denial, Plaintiff lived in constant fear of deportation and indefinite detention, knowing that a single procedural

error or false accusation could return them to the immigration system that had already proven capable of issuing life-destroying orders based on fabricated evidence. This fear became reality when Marchita Masters—the defendant whose fraudulent "malingering" diagnosis forms the foundation of the current vexatious litigant order— stated on the record that Plaintiff was "faking disability to maintain citizenship" (Exhibit H), causing a series of anxiety attacks so severe that one resulted in lung collapse requiring surgical intervention (Exhibit I: "Surgery 7-13-21"). Since that medical crisis, Plaintiff suffers from acute anxiety attacks triggered by any suggestion that someone might terminate their asylum and return them to deportation proceedings. Defendants' systematic denial of access to justice—through automated rejections, concealed motions, and impossible procedural requirements—directly triggers this medical trauma response, creating the same terror of institutional betrayal that caused Plaintiff's original disabilities.

42.    When Defendants reject court filings using automated "Document is defective" notations, dismiss cases based on improperly served motions, or impose prefiling requirements that are legal impossibilities, they replicate the same institutional betrayal: issuing orders based on false premises, then punishing the victim for being unable to comply with the impossible requirements. Each procedural rejection without meaningful review of Plaintiff's actual circumstances triggers the same medical crisis as the original immigration trauma.

## V.   MEDICAL DOCUMENTATION AND CURRENT DISABILITY STATUS

**43.**   Plaintiff's disabilities are both medically documented and legally recognized, having been forged through prolonged institutional betrayal and subsequently weaponized by the same systems that should provide accommodation. Clinical records confirm diagnoses of fibromyalgia causing chronic pain, fatigue, and mobility limitations; PTSD triggered by institutional betrayal and evidence-free rejection; gender dysphoria exacerbated by misgendering; and cognitive processing disorders requiring clear electronic communication.

**44.**   On August 11, 2023, the Social Security Administration issued a formal determination approving Plaintiff for Supplemental Security Income benefits, finding Plaintiff "disabled under sections 216(i) and 223(d)" of the Social Security Act. This federal determination represents one of the most rigorous disability evaluation processes in the United States government, involving multiple medical reviews, vocational assessments, and legal determinations. That this exhaustive process confirmed Plaintiff's disabilities while state court actors dismiss them demonstrates the institutional prejudice at work.

**45.**   The current cycle of judicial discrimination originates from the fraudulent "malingering" diagnosis that Defendants perpetuate. On June 3, 2021, Marchita Masters falsely diagnosed Plaintiff with "malingering"—a claim fabricated to attack Plaintiff's disability status. This false diagnosis became the pretext for a coordinated

campaign to terminate Plaintiff's disability benefits and justify discriminatory treatment across multiple institutions.

46. The "malingering" label was particularly devastating because it weaponized Plaintiff's trauma responses—the very symptoms caused by institutional betrayal—as evidence of bad faith. This created a feedback loop where seeking help triggered suspicion, and demonstrating need was interpreted as manipulation. The federal SSA determination conclusively refutes these false allegations and legally establishes Plaintiff's status as a "qualified individual with a disability" under the ADA.

47. Plaintiff now suffers from an acute, disability-based terror of procedural systems that issue false, predetermined rejections without reviewing evidence. Defendants' current practices—rejecting filings based on fraudulent predicates, refusing to review documentation, and issuing automated denials—are painful re-enactments of the original trauma. Each instance directly triggers Plaintiff's PTSD and anxiety disorders, creating a debilitating feedback loop where seeking justice exacerbates the very disabilities that require accommodation.

## VI. REQUIRED REASONABLE MODIFICATIONS

48. Due to Plaintiff's documented disabilities, Plaintiff requires specific reasonable modifications to access court services as guaranteed by the ADA. These accommodations are not preferences but medical necessities:

49.    Electronic filing and service: Necessary due to mobility limitations from fibromyalgia preventing travel to courthouses and standing in lines, combined with cognitive processing disorders that make paper-based systems inaccessible.

50.    Electronic notice: Required for time-sensitive materials due to inability to retrieve General Delivery mail because of mobility limitations and the 100-mile distance to the courthouse, compounded by PTSD triggers from bureaucratic interactions.

51.    Gender-neutral communication: Use of "Mx." honorific to prevent triggering severe psychological distress from gender dysphoria, where misgendering causes dissociation, panic attacks, and exacerbation of comorbid conditions.

52.    Clear, written instructions and deadline flexibility: Essential due to cognitive processing disorders that make navigating complex, changing procedural rules impossible without accommodation, particularly when combined with PTSD responses to procedural unpredictability.

53.    These accommodations are consistent with California Rule of Court 1.100 and federal ADA requirements. They have been formally requested multiple times using Judicial Council Form MC-410, "Request for Accommodations by Persons with Disabilities," with supporting medical documentation. Defendants have systematically rejected, ignored, or obstructed these requests through the institutional policies described herein.

## VII.  INSTITUTIONAL POLICY 1: AUTOMATED REJECTION OF DISABILITY ACCOMMODATION REQUESTS

**54.**    Both Defendants maintain institutional practices of adjudicating Plaintiff's disability accommodation requests through automated, non-individualized processes, issuing template denials that demonstrate no meaningful engagement with the ADA-required interactive process, thereby denying meaningful access to court services by reason of disability.

**55.**    On October 7, 2025, the Superior Court's e-filing system rejected Plaintiff's formal "Request for Reasonable Disability Accommodations" (Judicial Council Form MC-410) with the notation "Document is defective" (Exhibit F, "Envelope 25ED00053539"). This automated categorization demonstrates an institutional policy of screening out disability accommodations through technical rejection rather than substantive engagement with accommodation needs.

**56.**    The rejection occurred without any human review of the actual accommodation request, without any attempt to engage in the interactive process required by 28 C.F.R. § 35.130(b)(7), and without any consideration of whether the "defect" could be easily corrected. This represents not an isolated incident but part of an established pattern: multiple MC-410 requests have met similar automated rejections across different cases and filing attempts.

**57.**    The Court of Appeal's December 10, 2025 order in Case C105047 (Exhibit R, "C105047 - Order 12-10-25") illustrates this policy's circular nature: it

prospectively granted electronic communication while denying *nunc pro tunc* relief for deadlines missed due to the lack of such communication, citing California Rule of Court 1.100(d) which prohibits discussing merits in accommodation requests. This creates an institutional Catch-22: a litigant cannot argue in an accommodation request that the need for the accommodation caused the procedural default.

58.    The Court thus acknowledges the accommodation is necessary for future access while denying its necessity for past access, effectively punishing Plaintiff for not having accommodations that the Court itself refused to provide. This circular logic ensures that disabled litigants are always behind, always in default, and always subject to dismissal for failures caused by the lack of accommodations.

59.    Under the ADA and its implementing regulations, when a public entity receives a request for accommodation, it must engage in an "interactive process" to determine appropriate accommodations. This requires communication, flexibility, and good-faith exploration of options. Defendants have institutionally replaced this mandated process with automated rejection mechanisms that never engage with the substance of accommodation needs.

60.    There is no record of any court staff attempting to contact Plaintiff to clarify accommodation needs, suggest alternative accommodations, or engage in any dialogue about how to make court services accessible. The process begins and ends with "document is defective"—a bureaucratic termination rather than a collaborative

problem-solving process required by federal law.

61.    This policy violates multiple ADA provisions: (a) 28 C.F.R. §
35.130(b)(7), which requires public entities to make reasonable modifications and
engage in an interactive process; (b) 28 C.F.R. § 35.130(b)(1)(ii), which prohibits rules
that have the effect of discriminating against individuals with disabilities; and (c) the
ADA's fundamental requirement for an "individualized inquiry" into accommodation
needs rather than automated rejection.

62.    Defendants had actual knowledge of Plaintiff's disabilities through
multiple channels: formal MC-410 filings, medical documentation submitted with
court filings and explicit statements in pleadings, where disabilities were explained.
Despite this knowledge, they maintained policies that automatically reject
accommodation requests without substantive review, constituting deliberate
indifference to federally protected rights.

## VIII.  INSTITUTIONAL POLICY 2: DISCRIMINATORY, TWO-TIERED NOTICE ADMINISTRATION

63.    The Court of Appeal maintains a two-tiered notice system that provides
superior electronic service to represented parties while consigning disabled *pro se*
litigants to inaccessible physical mail, ensuring they cannot meaningfully participate in
appellate proceedings, thereby denying access by reason of disability.

64.    The Court of Appeal's own e-notice log for Case C105047 (Exhibit R,
"C105047 CV Letter LTS Yakovlev 12-5-25") irrefutably documents a discriminatory,

two-tiered notification system. On November 17, 2025, the Court sent a critical deadline letter via email to opposing counsel at his professional law firm address while simultaneously sending it only via physical mail to Plaintiff at an inaccessible "General Delivery" address.

65.    This institutional choice to deny Plaintiff efficient electronic service—despite possessing Plaintiff's valid email address from prior filings and knowledge of Plaintiff's documented mobility disabilities—reflects a systemic practice, not an isolated error. The discrimination is compounded by the letter's use of "Mr. Yakovlev," a willful disregard of Plaintiff's non-binary identity and requested "Mx." honorific, which signals an institutional refusal to acknowledge Plaintiff's fundamental personhood.

66.    The engineering of default becomes clear through the timeline: Plaintiff received this letter via email on December 5, 2025—after the November 24 deadline had passed (Exhibit R, "Gmail - REQUEST FOR CLARIFICATION Case C105047"). The Court then dismissed the appeal on December 3, 2025, for missing this deadline. This sequence demonstrates how the institutional notice policy functions as a trap: it provides notice in a manner calculated not to reach disabled litigants, then penalizes them for failing to respond.

67.    The timeline is particularly revealing: the Court issued the notice with a one-week deadline (November 17 to November 24), sent it via slow mail to Plaintiff

while emailing opposing counsel, and dismissed the appeal before Plaintiff could reasonably have received the notice. This is not accidental; it is systemic engineering of procedural default.

68.    "General Delivery" is not an accessible mailing address for someone with Plaintiff's documented mobility limitations. To retrieve General Delivery mail, one must travel to a specific post office during business hours, wait in line, present identification, and physically handle mail. For someone with severe fibromyalgia causing chronic pain and fatigue preventing standing, combined with PTSD creating anxiety about crowded spaces and bureaucratic interactions, this is not merely inconvenient—it is effectively impossible.

69.    Defendants know or should know this, as Plaintiff has repeatedly explained these limitations in accommodation requests and court filings. Yet they continue to use this method while providing electronic service to attorneys and respondents, creating a discriminatory two-tiered system that systematically disadvantages disabled litigants.

70.    This policy violates multiple ADA provisions: (a) 28 C.F.R. § 35.160, which requires public entities to provide appropriate auxiliary aids and services for effective communication; (b) 28 C.F.R. § 35.130(b)(1)(ii), which prohibits rules that have the effect of discriminating based on disability; and (c) the fundamental guarantee of meaningful access under 42 U.S.C. § 12132.

**71.**    While this Complaint focuses on ADA violations, the discriminatory notice scheme also raises serious equal protection concerns. The Court provides efficient, timely electronic notice to represented parties (overwhelmingly non-disabled due to their ability to hire counsel) while providing delayed, inaccessible notice to disabled *pro se* litigants. This creates a systematic advantage for one class of litigants over another based on disability status and representation status, which are often intertwined due to the economic impacts of disability.

## IX.    INSTITUTIONAL POLICY 3: CONCEALMENT OF DISPOSITIVE MOTIONS AND CONSTRUCTIVE DENIAL OF NOTICE

**72.**    The Superior Court maintains a practice of adjudicating cases based on documents it withholds from disabled *pro se* litigants, creating a "secret record" that fundamentally denies meaningful access to judicial proceedings, thereby violating the ADA's guarantee of equal participation.

**73.**    Exhibit T conclusively demonstrates that both the Motion to Dismiss and Motion for Sanctions were filed on July 17, 2025, as separate documents. However, the proof of service shows attempted email delivery to an address Plaintiff never authorized for service under California Code of Civil Procedure § 1010.6(a)(2). Plaintiff never received these critical motions due to this unauthorized and ineffective service method, combined with Defendants' knowledge of Plaintiff's documented inability to access physical mail due to mobility disabilities.

74.     In *Yakovlev v. Masters* (25CV1460), the dispositive orders of September 12, 2025 reference both a 'Motion to Dismiss' and 'Motion for Sanctions' filed July 17, 2025 (Exhibit T, pp. 686-695, 696-724). Despite multiple requests (Exhibit J, 'Envelope 25ED00054400,' 'Request for Copies 10-15-25'), neither Defendant nor the Court provided Plaintiff with copies of these motions until December 22, 2025—101 days after the court ruled on them (Exhibit T). The proof of service shows these were served via email to an address Plaintiff never authorized for service and never received.

75.     Plaintiff never received either the Motion to Dismiss or Motion for Sanctions prior to the September 12, 2025 ruling. The proof of service in Exhibit T shows service was attempted via email to an address Plaintiff never authorized for electronic service, in violation of the required service procedures. The Court's failure to provide the actual motion upon which it ruled—for over three months after ruling— constitutes a complete denial of meaningful access to the proceedings.

76.     Even when finally produced, Exhibit T reveals both motions were procedurally defective in their service. The proof of service shows attempted email delivery to an address Plaintiff never authorized for service (Exhibit T, pp. 694-695, 704-705)  California Code of Civil Procedure § 1010.6 requires party consent for electronic service, which was never given. The Court's acceptance and ruling on these improperly served motions, while knowing of Plaintiff's disability-related mail

THIRD AMENDED COMPLAINT FOR VIOLATIONS OF TITLE II OF THE ADA

limitations, constitutes a constructive denial of notice that violates the ADA's guarantee of meaningful access.

77.    Furthermore, the sanctions portion would be premature and procedurally defective, as the mandatory 21-day safe harbor period under § 128.7(c)(1) cannot be honored when judicial action on the combined dismissal is sought immediately. The Court's acceptance and ruling on such a defective motion, while concealing it from Plaintiff, compounds the ADA violation.

78.    The Court had a duty to ensure proper service and meaningful access for all parties, particularly disabled litigants requiring accommodations. Instead, it accepted and ruled on motions that were never properly served, adjudicating dispositive motions based on constructive notice that was impossible for Plaintiff to receive due to disability-related barriers.

79.    This denial of notice—being sanctioned and dismissed based on motions that were never properly served—constitutes a fundamental violation of the ADA's guarantee of meaningful access for disabled litigants who require accessible service methods. How can a disabled litigant meaningfully participate in proceedings when the dispositive instrument is kept secret? How can they request accommodations for a motion they don't know exists? How can they prepare a defense against arguments they haven't seen?

80.    This concealment directly implicates Plaintiff's disabilities. Plaintiff's

cognitive processing disorders require clear, organized presentation of legal arguments with adequate time for review. The trauma history creates particular vulnerability to surprise procedural maneuvers, which trigger anxiety and dissociation.

81.    By concealing the motion, the Court denied Plaintiff the opportunity to: (a) request accommodations for reviewing and responding to the motion; (b) seek clarification of arguments given cognitive processing limitations; (c) obtain assistance in understanding complex legal arguments; or (d) prepare a meaningful response within disability-appropriate timeframes. This is not just a procedural error; it is disability discrimination in the administration of court services.

82.    This practice of deciding cases on concealed evidence denies Plaintiff meaningful access to court proceedings by reason of disability. The ADA requires more than physical access to courtrooms; it requires meaningful participation in judicial processes. Concealing dispositive motions while ruling on them makes any participation illusory.

83.    This violates 28 C.F.R. § 35.130(b)(1)(ii) (rules that have discriminatory effects), § 35.130(b)(7) (failure to make reasonable modifications), and the basic guarantee of access under § 12132. The concealment directly triggers Plaintiff's disabilities while preventing any meaningful opportunity to participate, creating a perfect storm of discrimination.

84.    This is not an isolated incident. Exhibit T reveals a pattern: motions filed

but not served, documents referenced in orders but not provided, and a general opacity in court processes that disproportionately harms disabled litigants who rely on clarity and predictability. For non-disabled litigants with resources and legal representation, such concealment might be navigable; for a disabled *pro se* litigant, it is an absolute barrier.

## X.    INSTITUTIONAL POLICY 4: AUTOMATED, TEMPLATE-BASED ADJUDICATION WITHOUT INDIVIDUALIZED CONSIDERATION

**85.**    The Court of Appeal employs systems and practices that replace individualized judicial review with templated, automated decisions, particularly for disability-related requests and appeals from disabled litigants, denying the ADA-required individualized assessment and thereby discriminating by reason of disability.

**86.**    On November 21, 2025, the Court issued six substantively identical orders across three unrelated appeals (C104874, C104875, and C104876) (Exhibit R, "Gmail - Servicing Notification," "Extension - DENIED - EXTENSION OF TIME"). Each order contained identical boilerplate language and—most tellingly—erroneously listed the captions of all three unrelated cases. This demonstrates batch processing rather than case-specific review, violating the ADA's requirement for individualized consideration of disability accommodation needs.

**87.**    The inclusion of wrong case captions proves these were not individually crafted orders but template documents with fields populated incorrectly—the digital

equivalent of form letters. This mechanized adjudication replicates the trauma of Plaintiff's asylum denial—where decisions were issued without reviewing evidence—and triggers acute PTSD responses.

88.     On December 2-4, 2025, the Court issued orders denying reinstatement of appeals using identical language across multiple cases: "Appellant has failed to show 'it appears that the litigation [the appeal] has merit.'" (Exhibit R, "C104874 - Order - ORDER ON REHEARING DUE", "C104875 - Order - ORDER DENYING REHEARING", "C104876 - Order - ORDER DENYING REHEARING")

89.     The simultaneous issuance of these identical determinations for cases involving different respondents (a community college, housing developer/owner, In-Home Supportive Services (IHSS), and private individuals) and different factual claims shows *pro forma* processing that precludes genuine consideration of disability discrimination arguments. How could four different appeals involving different parties, different facts, and different legal issues all "fail to show merit" in exactly the same way, warranting exactly the same boilerplate language? The answer is they couldn't—unless the determination was automated rather than considered.

90.     In the appeal against Lake Tahoe Community College (C104874) (Exhibit R, "C104874 - Order - ORDER ON REHEARING DUE"), the Court's servicing notification and official mailing list erroneously included counsel for Defendant Marchita Masters—a party in a completely separate case (C105047). This fundamental

error in identifying the correct opposing counsel provides irrefutable evidence that the Court processed these appeals as an indistinguishable batch, without reviewing the basic record.

91.    If a human had looked at these cases individually, they would have noticed that Marchita Masters' attorney had no connection to a community college appeal. The error only makes sense if the cases were processed through an automated system that applied the same service list to multiple appeals without case-specific review.

92.    This policy violates the ADA's requirement for an "individualized inquiry" into accommodation needs. *Wong v. Regents of the University of California,* 192 F.3d 807, 818 (9th Cir. 1999). By applying template denials, the institution refuses to consider the unique ways Plaintiff's disabilities affect court access, effectively imposing a "one-size-fits-all" approach that excludes disabled litigants by reason of their specific disability-related needs.

93.    These template orders were issued in appeals that centrally involved disability discrimination claims. In C104874, Plaintiff alleged disability discrimination by a community college. In C104875, Plaintiff alleged housing discrimination based on disability. In C104876, Plaintiff alleged benefits discrimination. Yet the boilerplate orders make no mention of disability, accommodations, or the specific barriers Plaintiff faced.

**94.** They dismiss complex disability discrimination claims with the same generic language used for procedural defaults in commercial cases. This reflects an institutional blindness to disability issues—a refusal to see disability discrimination as requiring specialized consideration. That blindness itself constitutes discrimination under the ADA.

**95.** This is not about judicial workload or efficiency; it's about systemic exclusion. When courts automate decision-making, they build in assumptions about "normal" litigants—those who can navigate complex procedures without accommodations, those who can meet rigid deadlines without flexibility, those who can understand legal language without simplification. These assumptions systematically exclude disabled litigants whose needs deviate from this constructed norm.

**96.** The automation itself becomes a discriminatory barrier, filtering out those who don't fit the preset parameters. This is institutional discrimination: building systems that work for the majority while excluding minorities, then blaming the excluded for not fitting the system.

## XI.    INSTITUTIONAL POLICY 5: CIRCULAR FILING REQUIREMENTS AND PROCEDURAL TRAPS ("CATCH-22")

**97.** The Superior Court enforces vexatious litigant prefiling requirements in a manner that creates logically impossible barriers for disabled litigants, constituting an absolute denial of access by reason of disability through a systemic Catch-22

mechanism.

98.    On September 12, 2025, the Court rejected Plaintiff's filing with this notation: "Plaintiff is a vexatious litigant subject to a prefiling order under CCP § 391.7, subd. (a). To date, no prefiling order has been submitted." (Exhibit J, "Envelope 25ED00051363") This notation appears on multiple rejected filings across different cases, always with the same language, suggesting it is a template rejection rather than case-specific analysis.

99.    This creates an institutional Catch-22: the Court demands a prefiling order (Form VL-115) for any filing, but the request for that prefiling order (Form VL-110) is itself a filing that gets rejected for lacking the order. For disabled litigants who require accommodations to navigate this process, the circularity becomes an absolute bar. The Court then uses this manufactured non-compliance as grounds for dismissal and sanctions.

100.    It's like demanding a key to enter a room but refusing to give the key unless you're already in the room. For non-disabled litigants with resources, there might be workarounds (hiring an attorney to navigate the complexity, making multiple attempts, understanding obscure procedural workarounds). For disabled *pro se* litigants, particularly those with cognitive impairments, it's an insurmountable barrier.

101.    The fraudulent timeline exposed by Exhibit T reveals the depth of this procedural impossibility: The September 12, 2025 dismissal was predicated on

Plaintiff's failure to obtain a prefiling order. Yet, Exhibit T shows Plaintiff's first VL-110 request for this very case was filed in October 2025—weeks after the Court's September dismissal—and was denied via a boilerplate VL-115 order (Exhibit T, p. 17, 27).

**102.** The Court thus punished Plaintiff for failing to complete a statutory process that, by the Court's own docket, had not yet been initiated at the time of the dismissal. This isn't just a procedural error; it's a factual impossibility used as grounds for severe sanctions. The Court dismissed the case for failure to do something that couldn't yet be done.

**103.** This circular barrier disproportionately impacts disabled litigants in multiple ways: (a) Cognitive impairments make navigating complex, circular procedures particularly difficult; (b) Mobility limitations make multiple trips to court to attempt different approaches impossible; (c) The stress of facing impossible requirements triggers trauma responses, making calm problem-solving difficult; (d) The need for accommodations to even attempt the process requires first navigating the Catch-22 to request accommodations, creating a meta-Catch-22.

**104.** This policy operates as a permanent denial of access without consideration of disability-related needs. It violates the ADA by creating procedural requirements that are impossible for disabled litigants to navigate without accommodations, then punishing them for failing to comply.

**105.** Specifically, it violates: (a) 28 C.F.R. § 35.130(b)(1)(ii) (rules that have discriminatory effects); (b) 28 C.F.R. § 35.130(b)(7) (failure to make reasonable modifications); and (c) the integration mandate, which requires that disabled individuals not be segregated or subjected to separate rules. The Catch-22 effectively creates a separate, more difficult set of rules for those labeled vexatious—a label applied without disability accommodations or considerations.

**106.** California's vexatious litigant statutes (CCP § 391 et seq.) contain provisions for accommodations. The prefiling order requirement is not supposed to be an absolute bar but a screening mechanism. However, when applied without accommodations for disability, it becomes an absolute bar.

**107.** For example, a litigant with cognitive impairments might need assistance understanding what constitutes "new litigation," help completing the VL-110 form, or extra time to prepare the required showing. When courts deny these accommodations and apply the statute rigidly, they transform a screening mechanism into an exclusionary barrier. This misapplication discriminates against disabled litigants who could comply with accommodations but cannot comply without them.

## XII. INSTITUTIONAL POLICY 6: IDENTITY MISAPPLICATION WITHOUT VERIFICATION AND REFUSAL TO CORRECT

**108.** Both Defendants enforce a policy of applying restrictive litigation orders without verifying identity, then refusing to correct the error when presented with documentary proof, systematically denying access to disabled litigants who are

misidentified, thereby discriminating by reason of disability.

109.    Plaintiff's legal existence in the United States began with asylum approval on October 13, 2016 (Exhibits A and B: Asylum approval documents, SSN issuance). Prior to that date, Plaintiff was undocumented and could not have engaged in litigation without risking immediate deportation. Despite this documented timeline, both Defendants have systematically applied a 2009 San Francisco vexatious litigant prefiling order—issued against "Alex Yakovlev"—to Plaintiff, who is a different person with a distinct legal identity that post-dates the 2009 order by seven years.

110.    The documentary evidence is clear and overwhelming: different names ("Alex" vs. "Alexandr"), different immigration statuses (undocumented vs. asylee), different time periods (pre-2016 vs. post-2016), and different biographical details. No court has ever made a factual finding, based on evidence such as a Social Security number, date of birth, or sworn declaration, that Plaintiff is the same person as "Alex Yakovlev" (the subject of a 2009 vexatious litigant order).

111.    When Plaintiff provides documentation proving distinct identity (asylum approval, SSN issuance documents, declaration under penalty of perjury), Defendants refuse to review it. Instead, they continue applying the restrictions based on name similarity alone. This refusal is particularly striking given that the opposing party's motion to dismiss and for sanctions in the underlying case was filed against "Alexander Yakovlev"—a third distinct spelling.

112.   The court thus conflated three different names ("Alex," "Alexander," and "Alexandr") without checking any identifiers, demonstrating a pattern of automated, non-individualized enforcement. The Motion to Dismiss (Exhibit T, p. 686), Motion for Sanctions (Exhibit T, p. 696), and the final Order for Dismissal (Exhibit T, p. 724) all caption the case against "ALEXANDER YAKOVLEV." Plaintiff's established name is ALEXANDR YAKOVLEV.

113.   Basic due process requires that judgments be against properly named parties. Beyond due process, the ADA requires that court services be accessible, which includes getting a litigant's name right—a fundamental aspect of recognition and dignity. Misnaming someone repeatedly after correction demonstrates disregard for their personhood, which is particularly harmful to someone with trauma history and gender identity needs.

114.   Plaintiff's cognitive processing disorders and trauma history make Plaintiff particularly vulnerable to institutional misidentification and particularly harmed by the refusal to correct it. Trauma survivors often have fragmented identities and struggle with institutional recognition; having courts repeatedly apply the wrong identity reinforces feelings of invisibility and institutional betrayal.

115.   Cognitive impairments make it harder to navigate systems that have incorrect information, as the dissonance between reality and institutional records creates confusion and anxiety. The refusal to correct obvious errors despite clear

evidence demonstrates an institutional rigidity that disproportionately harms disabled individuals who need flexibility and accuracy in institutional interactions.

116. This policy of applying restrictions without verification, then refusing verification when challenged, discriminates against Plaintiff by reason of disability. It violates: (a) 28 C.F.R. § 35.130(b)(7) (failure to make reasonable modifications—here, the modification would be to verify identity before imposing severe restrictions); (b) the basic guarantee of meaningful access, as one cannot meaningfully access a system that has fundamentally misidentified them; and (c) the integration mandate, as misidentified individuals are effectively placed in a separate, more restrictive category based on erroneous information.

117. What makes this particularly egregious is the pattern: Plaintiff provides documentary proof of distinct identity; the court ignores it; Plaintiff is sanctioned for "vexatious" litigation that belongs to someone else; Plaintiff points out the error; the court dismisses the correction as frivolous; the cycle repeats. This is institutional gaslighting: telling someone they are who they are not, punishing them for that mistaken identity, then refusing to examine evidence to the contrary.

118. For someone with trauma history, this replicates the original trauma of being told false narratives about themselves by authorities and being powerless to correct them. The ADA should protect against such retraumatizing institutional practices.

## XIII.  INSTITUTIONAL POLICY 7: REFUSAL TO ACKNOWLEDGE NON-BINARY STATUS AND GENDER-NEUTRAL COMMUNICATION NEEDS

**119.**  Both Defendants maintain institutional practices that refuse to acknowledge Plaintiff's non-binary gender identity and related disability (gender dysphoria), despite formal requests and documented medical necessity, constituting direct disability discrimination under the ADA through denial of reasonable accommodations for effective communication.

**120.**  Judges and clerks persistently use "Mr." and "he" in hearings, communications, and orders despite Plaintiff's formal corrections and accommodation requests. This is not occasional oversight but consistent institutional practice. In the September 12, 2025 hearing before Judge Mayberry, Plaintiff corrected the judge twice regarding honorifics; the judge initially denied "this accommodation and exhibited irritation," then threatened to mute Plaintiff for further correction.

**121.**  This pattern repeats across proceedings: formal requests for "Mx." are ignored; corrections are met with hostility or indifference; the institution continues using male-gendered language. This demonstrates that the misgendering is not accidental but reflects institutional policy—a refusal to accommodate gender-related disability needs.

**122.**  In Plaintiff's December 5, 2025 Emergency Motion, filed with the Court of Appeal, Plaintiff expressly requested "Recognition of Distinct Identity" and use of

the honorific "Mx."—a medically necessary accommodation to prevent severe psychological distress from misgendering. The Court's December 17, 2025 one-sentence denial ("Appellant's 'Emergency Motion for Recognition of Distinct Identity, Relief from Improper Rejections, and for Judicial Review of Void Orders' is denied.") refused this accommodation without justification.

123.    The Court didn't say "we considered your request and deny it for these reasons"; it denied the entire motion without engagement, effectively dismissing the accommodation request without consideration. This reflects institutional prioritization of administrative convenience over disability rights.

124.    Plaintiff's gender dysphoria is a medically diagnosed condition under the DSM-5. Being misgendered triggers severe psychological distress, dissociation, panic attacks, and exacerbation of comorbid PTSD and depression. Medical literature consistently shows that gender-affirming practices (including correct naming and pronouns) significantly improve mental health outcomes for transgender and non-binary individuals, while misgendering correlates with increased depression, anxiety, and suicidality.

125.    The accommodation request for "Mx." is not a preference but a medical necessity to ensure Plaintiff can participate meaningfully in court proceedings without being re-traumatized. When courts refuse this accommodation, they are not merely being disrespectful; they are triggering documented medical harm.

**126.** Gender dysphoria is recognized as a disability under the ADA. See *Blatt v. Cabela's Retail, Inc.,* 286 F. Supp. 3d 656, 667 (E.D. Pa. 2017) (holding that gender dysphoria is not categorically excluded from ADA coverage); see also *Doe v. Massachusetts Dep't of Corr.,* 57 F.4th 23, 32 (1st Cir. 2023) (recognizing gender dysphoria as an ADA disability); see also 42 U.S.C. § 12211(b) (excluding "transvestism, transsexualism, pedophilia, exhibitionism, voyeurism, gender identity disorders not resulting from physical impairments, or other sexual behavior disorders" but not excluding gender dysphoria that results from a physical impairment) (ADA's exclusion of "transvestism, transsexualism, [...] gender identity disorders not resulting from physical impairments" does not apply to gender dysphoria, which results from the impairment of incongruence between gender identity and assigned sex).

**127.** As a disability, gender dysphoria requires reasonable accommodations, including gender-affirming language. Courts themselves have recognized this in employment contexts; there is no reason court systems should be exempt from their own ADA obligations.

**128.** The Court of Appeal's denial of Plaintiff's request violates multiple ADA provisions: (a) 28 C.F.R. § 35.130(b)(7) (failure to make reasonable modifications to policies when necessary to avoid discrimination—here, modifying forms and templates to use correct honorifics); (b) 28 C.F.R. § 35.130(b)(1)(ii) (subjecting Plaintiff to different rules of participation based on disability—here, requiring Plaintiff to endure

misgendering while others receive correct honorifics); and (c) 28 C.F.R. § 35.160 (failure to provide appropriate auxiliary aids and services for effective communication—gender-affirming language is an auxiliary aid for someone with gender dysphoria).

129. The ADA's effective communication requirement extends beyond interpreters for deaf individuals to all accommodations necessary for equal participation. Gender-affirming language is a reasonable accommodation for gender dysphoria, analogous to wheelchair ramps for mobility impairments.

130. Defendants had actual knowledge of Plaintiff's gender dysphoria diagnosis and accommodation needs through: formal ADA accommodation requests (Form MC-410), direct requests in pleadings and motions, medical documentation submitted with filings, and court hearings where the issue was discussed. Despite this knowledge, the institution maintains a policy of refusing gender-affirming accommodations, demonstrating deliberate indifference to federally protected rights.

131. This refusal to accommodate gender identity is part of the same institutional mindset that: refuses to verify Plaintiff's distinct legal identity; uses automated systems to reject disability accommodation requests as "defective"; implements discriminatory notice schemes; and issues template denials without individualized review. Each component reinforces the message that Plaintiff's disabilities are irrelevant to the institution, and accommodations will be systematically

denied.

132.  Every instance of misgendering by the Court of Appeal re-traumatizes Plaintiff, triggering flashbacks to previous institutional invalidations (including the wrongful asylum denial and detention) and causing measurable medical harm. The Court's refusal to use "Mx." is not merely disrespectful—it is medically harmful disability discrimination that actively prevents Plaintiff from accessing the courts on equal terms.

### XIV.  INSTITUTIONAL POLICY 8: SYSTEMIC FILING OBSTRUCTION TO PREVENT CORRECTION OF ERRORS

133. To prevent exposure of the identity fraud and the void nature of the underlying September 12, 2025 orders, the Superior Court implemented a dual-track obstruction policy documented in Plaintiff's December 5, 2025 Emergency Motion (Exhibit S), systematically denying access to corrective mechanisms by reason of disability.

134. The Court rejected Plaintiff's Notice of Appeal filings using legally invalid reasons including "case has been dismissed with prejudice" and vague "document is defective" notations. These rejections are improper because: (a) a dismissal with prejudice doesn't eliminate the right to appeal—it creates the right to appeal; (b) "document is defective" without specification violates basic notice requirements; and (c) these rejections occurred without any opportunity to correct alleged defects, contrary to standard court practice.

**135.** Seventeen separate filing envelopes were left in "Submitted" status for over 30 days—far beyond the 72-hour processing standard in the court's own e-filing system (Exhibit S). This stalling ensures that appellate timelines expire, making appeals untimely. For someone with cognitive impairments who relies on clear timelines and procedures, this indefinite pending status creates confusion and prevents effective navigation of the process.

**136.** One envelope (25ED00053127) shows "NO DOCUMENTS LISTED"—a technical impossibility indicating post-submission tampering to conceal filed documents. If documents were never uploaded, the envelope couldn't be submitted; if they were uploaded and later removed, that's tampering. Either scenario demonstrates serious procedural irregularities.

**137.** For a trauma survivor, such inconsistencies trigger feelings of instability and betrayal—the system appears to be changing records, gaslighting the litigant about what was filed. This is particularly disabling for someone whose trauma involves institutional dishonesty.

**138.** Rather than address the meritorious claims in Plaintiff's December 5, 2025 Emergency Motion—which included proof of distinct identity, evidence of forged service, documentation of ADA violations, and record of the filing obstruction pattern—the Court of Appeal issued a one-sentence denial on December 17, 2025: "Appellant's 'Emergency Motion for Recognition of Distinct Identity, Relief from

Improper Rejections, and for Judicial Review of Void Orders' is denied."

139. This blanket refusal exemplifies the institutional policy of non-engagement with substantive disability and due process claims. The Court refused to: acknowledge Plaintiff's distinct identity despite documentary proof; address the systematic filing rejections that blocked appellate review; review the void orders obtained through fraudulent service; or consider the ADA violations in service methods.

140. This demonstrates that the institution prioritizes administrative closure over constitutional and statutory compliance. The refusal to examine evidence of systemic procedural violations shows deliberate indifference to the integrity of the judicial process itself.

141. This obstruction isn't limited to one court or one clerk; it's cross-institutional. The Superior Court obstructs filing; the Court of Appeal refuses to address the obstruction; together they create a seamless wall of exclusion. When Plaintiff tries one avenue, it's blocked; when they try another, it's blocked differently; when they point out the pattern, they're ignored.

142. This coordinated evasion suggests institutional policy, not individual error. It's particularly harmful to disabled litigants who may not have the resources to fight on multiple fronts simultaneously and who may be more easily discouraged by repeated barriers.

143. This coordinated obstruction prevents Plaintiff from seeking correction of

disability-based discrimination through normal appellate channels, denying meaningful access to the courts by reason of disability. It violates: (a) 28 C.F.R. § 35.130(b)(1)(ii) (rules with discriminatory effects—here, obstructionist practices that disproportionately impact disabled litigants); (b) 28 C.F.R. § 35.130(b)(7) (failure to make reasonable modifications—such as providing clear filing instructions or accommodating filing difficulties); and (c) the fundamental access guarantee of 42 U.S.C. § 12132.

**144.** Both courts have been explicitly informed of the filing obstructions through multiple motions and requests. They have taken no corrective action. Instead, they've used the resulting procedural defaults (missed deadlines from stalled filings, lack of proper appeals from rejected filings) as grounds for further adverse actions. This constitutes deliberate indifference: knowledge that harm to federally protected rights is occurring, and failure to act.

## XV.    HARM CAUSED BY DEFENDANTS' ADA VIOLATIONS

**145. Loss of Fundamental Rights:** Defendants' policies have permanently blocked Plaintiff from appealing four cases involving severe disability discrimination:

**146. Housing Discrimination (25CV1718):** Eviction from disabled housing after refusal to accommodate hoarding disorder and hostile environment. This case involved a landlord who refused to provide reasonable accommodations for Plaintiff's disability-related needs, creating a hostile environment that forced Plaintiff from

accessible housing. The inability to appeal this decision means Plaintiff has no remedy for illegal housing discrimination.

**147.    Education Discrimination (25CV1332):** Expulsion from Lake Tahoe Community College due to manifestations of acrophobia, reported antisemitism, bullying, and injuries during outdoor class. The college failed to accommodate Plaintiff's disability-related limitations and provided an educational environment that was hostile to disabled students. Without appellate review, this discrimination goes unremedied.

**148.    Public Benefits Fraud (25CV1748):** Retaliation for reporting fraudulent IHSS contracts and stolen public funds. This case involved whistleblowing about disability services fraud, followed by retaliation that threatened Plaintiff's access to essential services. The inability to appeal leaves systemic fraud unchecked and whistleblowers unprotected.

**149.    Benefits Termination Attempt (25CV1460):** Efforts to terminate SSI benefits based on false allegations of "faking" disability, threatening Plaintiff's asylum status with following deportation to indefinite immigration detention (Exhibit I, "Surgery 7-13-21 (1) malingering 6/03/2021"; Exhibit H, "Barton Marchita Addendums"). This case directly threatens Plaintiff's survival income and could result in loss of legal status.

**150.    These cases cannot now be appealed due to Defendants' institutional

barriers, effectively immunizing third-party discriminators from judicial review. This is not just about individual cases; it's about systemic impunity. When courts create barriers that prevent review of discrimination claims, they become complicit in the discrimination. The ADA violations by the courts enable and perpetuate ADA violations by others.

151.   **Severe Medical and Psychological Injury:** The stress of navigating an inaccessible judicial system has caused documented medical harm directly resulting from Defendants' ADA violations:

152.   **Psychiatric hospitalization for suicidal ideation (July 23, 2024)** (Exhibit I, "ER 7-23-24"). Medical records explicitly link this crisis to housing discrimination and inability to access legal remedies. The hospitalization occurred after Defendant refused to acknowledge evidence of the housing discrimination case, leaving Plaintiff with no legal remedy for losing accessible housing.

153.   **Emergency hospitalization on September 13, 2025,** for abdominal pain, vomiting, and acute anxiety directly attributed by medical personnel to the September 12 court hearing (Exhibit I, "ER 9-13-25"). The treating physician noted "symptoms exacerbated by court-related stress" and "PTSD trigger from perceived unfair proceedings." This hospitalization occurred the day after the hearing where Defendants' policies resulted in dismissal and sanctions based on the concealed motion.

**154.    Collapsed lung (pneumothorax) induced by court-related anxiety** (Exhibit I, "Surgery 7-13-21"). Medical records show the pneumothorax occurred because of anxiety attack related to Defendant (Case 25CV1460) forged medical records and humiliated Plaintiff (Exhibit H, "Barton Marchita addendums"). The surgical intervention was directly linked to stress-induced physiological responses.

**155.    Development of new disabling conditions,** including aquaphobia (fear of water triggered by near-drowning experience during a PTSD episode related to court stress). Each court interaction that replicates the original institutional betrayal creates new trauma responses and additional disabilities.

**156.    Severe exacerbation of baseline PTSD, depression, and gender dysphoria,** documented in ongoing psychiatric treatment records. The medical evidence shows measurable deterioration in functioning directly traceable to Defendants' discriminatory practices.

**157.    The Trauma Feedback Loop:** Each court interaction that replicates the original institutional betrayal (denial without review, concealment, misidentification) retraumatizes Plaintiff, worsening disabilities, which then make navigating court processes even harder, leading to more negative outcomes, which further traumatize, in a vicious cycle.

**158.    This is disability discrimination compounded: first the court fails to accommodate    disabilities,    then    it    punishes    the    manifestations    of    those

unaccommodated disabilities, then the punishment worsens the disabilities, making future accommodation even more necessary but even less likely. The system is designed in a way that ensures disabled litigants fail, then blames them for failing.

159.  **Imminent Existential Threat:** The $20,880.50 sanctions order in *Yakovlev v. Masters* (25CV1460) (Exhibit D, "25CV1460 Order and Motion for Sanctions") is not a legitimate debt but the direct product of the institutional ADA violations described herein. This sanction was imposed concurrently with a void dismissal order that was itself granted on a motion Plaintiff never received, based on a prefiling requirement that was a legal impossibility at the time.

160.  Defendants' policies of automated rejection, discriminatory notice, and refusal of accommodations are now actively preventing Plaintiff from challenging this fraudulent judgment in any state forum. The imminent garnishment of Plaintiff's SSI benefits—which would cause immediate homelessness, starvation, medical crisis, and death—is therefore a direct and intended consequence of Defendants' ADA violations that deny access to correct fundamental judicial errors.

161.  **The Ripple Effects of Exclusion:** When courts exclude disabled litigants, the harm extends beyond the individual case. It sends a message to other disabled individuals that the justice system is not for them. It enables discriminators to act with impunity, knowing their victims cannot effectively seek redress. It undermines public confidence in the judiciary as an impartial arbiter. And it violates the ADA's promise

of equal participation in civic life.

162.   Plaintiff's case illustrates these ripple effects: because Plaintiff cannot access courts, a landlord can evict a disabled tenant without accommodation, a college can expel a disabled student, a benefits provider can commit fraud, and a litigant can obtain sanctions through fraud—all with judicial complicity through denial of access. This creates a society where disabled people have no meaningful legal protection against discrimination.

## XVI.  COUNT I: VIOLATION OF TITLE II OF THE AMERICANS WITH DISABILITIES ACT (42 U.S.C. § 12132) - AUTOMATED ACCOMMODATION DENIAL

163.   Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

164.   Defendants are "public entities" under 42 U.S.C. § 12131(1) as departments of the State of California judicial branch.

165.   Plaintiff is a "qualified individual with a disability" under 42 U.S.C. § 12131(2), as established by the Social Security Administration's August 11, 2023 formal disability determination and extensive medical documentation.

166.   Defendants have excluded Plaintiff from participation in, denied Plaintiff the benefits of, and subjected Plaintiff to discrimination in court services, programs, and activities by reason of disability, in violation of 42 U.S.C. § 12132, through their institutional policy of automated rejection of disability accommodation requests.

167.   **Specific Violations - Automated Accommodation Denial:**

**a.** Defendants maintain an institutional policy of rejecting Form MC-410 accommodation requests through automated "Document is defective" notations without human review, violating 28 C.F.R. § 35.130(b)(7)'s requirement for individualized interactive process;

**b.** This policy has the purpose and effect of defeating court access objectives for disabled individuals, violating 28 C.F.R. § 35.130(b)(3);

**c.** By automating rejection of accommodation requests, Defendants fail to make reasonable modifications necessary to avoid discrimination, violating the ADA's fundamental requirement for individualized inquiry.

### XVII. COUNT II: VIOLATION OF TITLE II OF THE AMERICANS WITH DISABILITIES ACT (42 U.S.C. § 12132) - DISCRIMINATORY NOTICE SYSTEM

**168.** Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

**169.** Defendants have excluded Plaintiff from participation in, denied Plaintiff the benefits of, and subjected Plaintiff to discrimination in court services, programs, and activities by reason of disability, in violation of 42 U.S.C. § 12132, through their institutional policy of maintaining a two-tiered notice system.

**170. Specific Violations - Discriminatory Notice:**

**a.** Defendants maintain a policy of providing electronic notice to represented parties while consigning disabled *pro se* litigants to inaccessible physical mail, violating 28 C.F.R. § 35.160's requirement for effective communication;

**b.** This two-tiered system has the effect of discriminating against individuals with disabilities, violating 28 C.F.R. § 35.130(b)(1)(ii);

**c.** By denying electronic notice while knowing of Plaintiff's mobility disabilities and mail inaccessibility, Defendants fail to provide auxiliary aids necessary for equal participation.

### XVIII. COUNT III: VIOLATION OF TITLE II OF THE AMERICANS WITH DISABILITIES ACT (42 U.S.C. § 12132) - CONCEALMENT OF DISPOSITIVE MOTIONS

**171.** Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

**172.** Defendants have excluded Plaintiff from participation in, denied Plaintiff the benefits of, and subjected Plaintiff to discrimination in court services, programs, and activities by reason of disability, in violation of 42 U.S.C. § 12132, through their institutional practice of adjudicating cases based on concealed documents.

**173. Specific Violations - Concealment of Motions:**

**a.** Defendants maintain a policy of ruling on dispositive motions while withholding them from disabled *pro se* litigants, violating 28 C.F.R. § 35.160's effective communication requirements;

**b.** This concealment denies meaningful access to judicial proceedings, violating the fundamental guarantee of access under 42 U.S.C. § 12132;

**c.** By concealing the July 17, 2025 Motion to Dismiss for 101 days after ruling on it, Defendants prevented Plaintiff from requesting accommodations or preparing

meaningful responses.

### XIX. COUNT IV: VIOLATION OF TITLE II OF THE AMERICANS WITH DISABILITIES ACT (42 U.S.C. § 12132) - AUTOMATED TEMPLATE ADJUDICATION

174.    Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

175.    Defendants have excluded Plaintiff from participation in, denied Plaintiff the benefits of, and subjected Plaintiff to discrimination in court services, programs, and activities by reason of disability, in violation of 42 U.S.C. § 12132, through their institutional policy of automated template adjudication.

176.    **Specific Violations - Template Adjudication:**

**a.** Defendants issue identical boilerplate orders across unrelated cases without individualized review, violating the ADA's requirement for individualized consideration of accommodation needs;

**b.** This automated processing fails to consider how disabilities affect court access, violating 28 C.F.R. § 35.130(b)(7)'s reasonable modification requirement;

**c.** The batch processing of disability-related appeals with identical "no merit" determinations demonstrates deliberate indifference to disability discrimination claims.

### XX. COUNT V: VIOLATION OF TITLE II OF THE AMERICANS WITH DISABILITIES ACT (42 U.S.C. § 12132) - CIRCULAR PROCEDURAL TRAPS

177.    Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

178.    Defendants have excluded Plaintiff from participation in, denied Plaintiff

the benefits of, and subjected Plaintiff to discrimination in court services, programs, and activities by reason of disability, in violation of 42 U.S.C. § 12132, through their institutional enforcement of impossible procedural requirements.

**179.  Specific Violations - Catch-22 Procedures:**

**a.** Defendants maintain a policy demanding prefiling orders for filings while rejecting requests for prefiling orders as filings lacking prefiling orders, creating an impossible barrier;

**b.** This circular logic operates as a permanent denial of access without consideration of disability-related needs, violating 28 C.F.R. § 35.130(b)(1)(ii);

**c.** The policy disproportionately impacts litigants with cognitive impairments who require clear, sequential procedural guidance, violating 28 C.F.R. § 35.130(b)(7).

## XXI. COUNT VI: VIOLATION OF TITLE II OF THE AMERICANS WITH DISABILITIES ACT (42 U.S.C. § 12132) - IDENTITY MISAPPLICATION

**180.**  Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

**181.**  Defendants have excluded Plaintiff from participation in, denied Plaintiff the benefits of, and subjected Plaintiff to discrimination in court services, programs, and activities by reason of disability, in violation of 42 U.S.C. § 12132, through their institutional policy of applying restrictions without identity verification.

**182.  Specific Violations - Identity Misapplication:**

**a.** Defendants apply a 2009 vexatious litigant order against "Alex Yakovlev" to

Plaintiff "Alexandr Yakovlev" without documentary verification, despite clear evidence of distinct identity;

**b.** This misapplication violates 28 C.F.R. § 35.130(b)(7) by failing to make reasonable modifications necessary to avoid discrimination based on erroneous identity;

**c.** The refusal to correct documented identity errors subjects Plaintiff to procedures from which they are legally exempt, denying meaningful access to properly identified court services.

### XXII. COUNT VII: VIOLATION OF TITLE II OF THE AMERICANS WITH DISABILITIES ACT (42 U.S.C. § 12132) - FAILURE TO ACCOMMODATE GENDER DYSPHORIA

**183.**   Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

**184.**   Defendants have excluded Plaintiff from participation in, denied Plaintiff the benefits of, and subjected Plaintiff to discrimination in court services, programs, and activities by reason of disability, in violation of 42 U.S.C. § 12132, through their institutional refusal to accommodate gender dysphoria.

**185.   Specific Violations - Gender Dysphoria Accommodation:**

**a.** Defendants maintain a policy of refusing to use the gender-neutral honorific "Mx." despite medical documentation of gender dysphoria, violating 28 C.F.R. § 35.130(b)(7);

**b.** This misgendering triggers severe psychological distress, violating 28 C.F.R.

§ 35.160's requirement for effective communication;

**c.** The refusal to provide gender-affirming language as a reasonable accommodation constitutes deliberate indifference to a medically diagnosed disability.

## XXIII. COUNT VIII: VIOLATION OF TITLE II OF THE AMERICANS WITH DISABILITIES ACT (42 U.S.C. § 12132) - SYSTEMIC FILING OBSTRUCTION

**186.** Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

**187.** Defendants have excluded Plaintiff from participation in, denied Plaintiff the benefits of, and subjected Plaintiff to discrimination in court services, programs, and activities by reason of disability, in violation of 42 U.S.C. § 12132, through their institutional policy of filing obstruction.

**188. Specific Violations - Filing Obstruction:**

**a.** Defendants maintain policies of improper rejections, indefinite stalling, and evidence tampering that prevent correction of ADA violations;

**b.** These obstructionist practices have discriminatory effects on disabled litigants who need clear procedures and cannot navigate indefinite delays, violating 28 C.F.R. § 35.130(b)(1)(ii);

**c.** The coordinated cross-institutional obstruction denies meaningful access to appellate review of disability discrimination claims, violating the fundamental right of access under 42 U.S.C. § 12132.

## XXIV. PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that this Court grant the following relief:

**DECLARATORY JUDGMENT**

1.    **Declare** that the customs and practices of the Defendant courts, as alleged herein—including the automated rejection of accommodation requests, discriminatory notice systems providing electronic service to attorneys while denying it to disabled *pro se* litigants, concealment of dispositive motions (as documented in Exhibit T), automated template adjudication without case-specific review, circular procedural traps creating impossible filing requirements, identity misapplication without verification, refusal of gender-neutral communication, and systematic filing obstruction—violate Title II of the Americans with Disabilities Act (42 U.S.C. § 12132).

**INJUNCTIVE RELIEF**

Issue a permanent injunction pursuant to *Ex parte Young* and *Tennessee v. Lane* to halt the ongoing ADA violations by the Defendant courts and to afford Plaintiff meaningful access to the courts:

**AS TO BOTH DEFENDANTS**

2.    **Enjoin** the judges, clerks, and all personnel of the Defendants' courts from:

**a.** Applying any vexatious litigant prefiling order or similar restriction to Plaintiff without first verifying Plaintiff's distinct legal identity against documentary

proof;

**b.** Denying Plaintiff's reasonable accommodation requests made pursuant to Form MC-410 or clear written request without engaging in the ADA-required interactive process;

**c.** Using male-gendered honorifics ("Mr.") or pronouns ("he/him") when referring to Plaintiff in any court communication, order, docket entry, or hearing;

**d.** Sending any notice, order, or communication to Plaintiff via physical mail without simultaneous electronic service to 750emerealdbay@gmail.com;

**e.** Processing Plaintiff's filings through automated systems without human review for accommodation needs and disability-related errors;

**f.** Issuing template orders in Plaintiff's cases without individualized consideration of disability arguments and accommodation needs.

**3.**     **Enjoin** said officials to:

**a.** Provide all notices, orders, and service of process to Plaintiff via the email address 750emerealdbay@gmail.com as the primary method;

**b.** Use the gender-neutral honorific "Mx." and the pronouns "they/them" for Plaintiff in all court communications, orders, and docket entries;

**c.** Engage in an interactive process with Plaintiff to determine and provide effective reasonable modifications for Plaintiff's documented disabilities;

**d.** Designate an ADA coordinator responsible for ensuring compliance with this

injection;

**AS TO DEFENDANT SUPERIOR COURT OF CALIFORNIA, COUNTY OF EL DORADO:**

**4.**     **Enjoin** the presiding judge and clerk from enforcing the September 12, 2025 orders in *Yakovlev v. Masters* (25CV1460), and remand the matter for proceedings consistent with the ADA, with instructions to:

**a.** Accept and substantively process Plaintiff's pending Request for Reasonable Disability Accommodations (Form MC-410) within 14 days;

**b.** Vacate any sanctions or dismissal orders predicated on Plaintiff's failure to comply with a prefiling order requirement that was a legal impossibility;

**c.** Allow Plaintiff 60 days from provision of accommodations to file responses to any pending motions;

**AS TO DEFENDANT CALIFORNIA COURT OF APPEAL, THIRD APPELLATE DISTRICT:**

**5.**     **Enjoin** the presiding justice and clerk from enforcing the December 2025 dismissal orders in Appeals C104874, C104875, C104876, and C105047, and remand those appeals with instructions to:

**a.** Toll all applicable deadlines pending resolution of accommodation issues;

**b.** Provide Plaintiff with an ADA-compliant opportunity to be heard on the merits;

**RETAINED JURISDICTION**

**6.**     **Retain jurisdiction** over this matter for thirty-six (36) months to monitor

compliance;

**7.    Grant** any further equitable relief the Court deems just and proper.

DATED: January 10, 2026

Respectfully submitted,

*Alexandr Yakovlev*

ALEXANDR YAKOVLEV
Plaintiff, Pro Se

**VERIFICATION**

I, Alexandr Yakovlev, declare under penalty of perjury under the laws of the United States of America that the foregoing Third Amended Complaint is true and correct.

Executed on January 10, 2026, at South Lake Tahoe, California.

*Alexandr Yakovlev*

ALEXANDR YAKOVLEV
Plaintiff, Pro Se

**LIST OF EXHIBITS**

- **Exhibit A** – U.S. Customs and Border Protection Asylum Approval (Form I-94, Oct. 13, 2016)

- **Exhibit B** – Social Security Administration Letter Confirming SSN Application Acceptance (Oct. 20, 2016)

- **Exhibit C** – Comprehensive Eastern European Naming Analysis Document ("Alex" Variants)

- **Exhibit D** – **Court Filings from *Yakovlev v. Masters*** (Orders on Motions to Dismiss/Sanctions, Request for Copies)

- **Exhibit E** – Rejected E-Filing Envelopes (25ED00052436, 25ED00053165)

- **Exhibit F** – Rejected E-Filing Envelope 25ED00053539 (ADA Accommodation Request, Oct. 7, 2025)

- **Exhibit G** – Court of Appeal Letter (Oct. 21, 2025) Rejecting Motion for Distinct Identity & Fee Waiver

- **Exhibit H** – Barton Health Medical Records (June 2021) – Therapy notes by Dr. Marchita Masters & patient addendums

- **Exhibit I** – **Comprehensive Medical Records** – Includes:

  ○ Emergency Dept. visit for abdominal pain (Sep. 13, 2025)

  ○ Emergency Dept. visit for suicidal ideation (Jul. 23, 2024)

  ○ **Pneumothorax surgery notes (Jul. 13, 2021)**

- **Exhibit J** – **Proof of Court's Failure to Process** – Shows accepted but unprocessed Notice of Appeal vs. properly served discovery request (Sep. 12, 2025)

- **Exhibit K** – **Court of Appeal "Copy-Paste" Denial Orders** – For multiple appeals (e.g., C105047, C104786), alleged to be automated and lacking individualized review.

- **Exhibit L** – Court of Appeal Letters (Oct. 30 & Nov. 17, 2025)

demonstrating persistent misgendering ("Mr." vs. "Mx.")

- **Exhibit M** – Vexatious Litigant Prefiling Order & Correspondence (Case 25CV1460 - *Masters*)

- **Exhibit N** – Vexatious Litigant Prefiling Order & Correspondence (Case 25CV1332 - *Lake Tahoe Community College*)

- **Exhibit O** – Vexatious Litigant Prefiling Order & Correspondence (Case 25CV1718 - *Supportive Housing*)

- **Exhibit P** – Vexatious Litigant Prefiling Order & Correspondence (Case 25CV1748 - *Bridges*)

- **Exhibit Q** – Email Correspondence with Court of Appeal Clerk's Office (Nov. 6-7, 2025)

- **Exhibit R** – Court of Appeal Service Notifications demonstrating systemic errors (misgendering, incorrect service).

- **Exhibit S** – **Emergency Motion Packet (Filed Dec. 5, 2025)** – Includes Notice, Memorandum, Declaration, and Exhibits A-F.

- **Exhibit T** – **727-Page State Court Record Production (Index for 25CV1460)** – Contains procedural records, VL filings, Defendant's evidence, and key motions/orders leading to dismissal.